UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

KEVIN DON FOSTER,

       Petitioner,

v.                                Case No:  2:14-cv-597-JES-KCD

SECRETARY, DEPARTMENT OF
CORRECTIONS,

       Respondent.
_____

## OPINION AND ORDER

This matter comes before the Court on Petitioner Kevin Don Foster's Amended Petition for Writ of Habeas Corpus by a Person in State Custody (Doc. #89), the Secretary's Responses (Docs. #27 and #92), and Foster's Replies (Docs. #44 and #98).[1]  For the reasons set forth below, the Court denies the Amended Petition.

### I.  Background

Foster was convicted of murdering Mark Schwebes and sentenced to death.  The Florida Supreme Court accurately summarized the factual and procedural background in its opinion affirming the conviction and sentence:

---

[1] Foster's Amended Petition asserts the nine claims raised in his original Petition (Doc. #1) and three new claims.  The Secretary's original Response addresses the original nine claims, and his Response to Foster's Amended Petition addresses the three new claims.

TRIAL

The evidence presented at trial established that in early April of 1996, a few teenagers organized a group called the "Lords of Chaos." The original membership of the group was made up of Foster, Peter Magnotti and Christopher Black, the latter two of whom were attending Riverdale High School ("Riverdale") at the time. Foster, the leader of the Lords of Chaos, was not a student. The group eventually grew to later include, among other Riverdale students, Derek Shields, Christopher Burnett, Thomas Torrone, Bradley Young and Russell Ballard as additional members. Each member of the Lords of Chaos had a secret code name. Foster's code name was "God." The avowed purpose of the group was to create disorder in the Fort Myers community through a host of criminal acts.

On April 30, 1996, consistent with its purpose, the group decided to vandalize Riverdale and set its auditorium on fire. Foster, Black, and Torrone entered Riverdale and stole some staplers, canned goods, and a fire extinguisher to enable them to break the auditorium windows. Leading the group, Foster carried a gasoline can to start the fire in the auditorium while the other group members, Shields, Young, Burnett, Magnotti, and Ballard, kept watch outside.

The execution of the vandalism was interrupted at around 9:30 p.m., when, to the teenagers' surprise, Riverdale's band teacher, Mark Schwebes, drove up to the auditorium on his way from a school function nearby. Upon seeing the teacher, Foster ran, but Black and Torrone were confronted by Schwebes who seized the stolen items from them. Schwebes told them that he would contact Riverdale's campus police the next day and report the incident. Schwebes then left to have dinner with a friend, David Adkins.[FN1]

> FN1. Adkins testified that he saw Schwebes' vehicle parked at the spot where Black and Torrone were caught by Schwebes at about 9:30 p.m. He also saw someone running from the general location of Schwebes' vehicle.

When Black and Torrone rejoined the others, Black declared that Schwebes "has got to die," to which Foster

replied that it could be done and that if Black could not do it, he would do it himself. Foster was apparently concerned that the arrest of Black and Torrone would lead to the exposure of the group and their criminal activities.

Subsequently, Black suggested that they follow Schwebes and make the killing look like a robbery. However, upon further discussion, the group decided to go to Schwebes' home and kill him there instead. Foster then told the group that he would go home and get his gun. They obtained Schwebes' address and telephone number through a telephone information assistance operator, and confirmed this information by calling and identifying Schwebes' voice on his answering machine. They then went to Foster's home where they obtained a map to confirm the exact location of Schwebes' address, and procured gloves and ski masks in preparation for the killing. Foster decided to use his shotgun in the killing, and replaced the standard birdshot with # 1 buckshot, a more deadly ammunition. The group also retrieved a license tag they had stolen earlier to use during the crime.

Black, Shields, Magnotti, and Foster agreed to participate in the murder, and at 11:30 p.m., drove to Schwebes' home. Shields agreed to knock at the door and for Black to drive. When the group finally arrived there, Foster and Shields walked up to Schwebes' door, and as Shields knocked, Foster hid with the shotgun. As soon as Schwebes opened the door, Shields got out of the way, Foster stepped in front of Schwebes and shot him in the face. As Schwebes' body was convulsing on the ground, Foster shot him once more.

Although there were no other eyewitnesses, two of Schwebes' neighbors heard the shots and a car as it left the scene.[FN2] Paramedics arrived at the scene almost immediately and declared Schwebes dead. The medical examiner confirmed that Schwebes died of shotgun wounds to his head and pelvis, and that Schwebes would have died immediately from the shot to the face.

> FN2. The two witnesses testified to hearing a car with a loud muffler leaving immediately after the two shots. Shields' car had a bad muffler. One testified to seeing a car driving away.

On the way to Foster's home after the killing, the group
stopped to remove the stolen tag, and Foster wiped off
the tag to remove any fingerprints before discarding it.
Once home, the four of them got into a "group hug" as
Foster congratulated them for successfully sticking to
the plan. Foster then called Burnett and Torrone and
boasted about how he blew off part of Schwebes' face and
to watch for it in the news. The next day, on May 1,
1996, while at Young's apartment, the six o'clock news
reported the murder, and Foster continuously laughed,
hollered, and bragged about it. Young testified that
Foster said that he looked Schwebes right in the eyes
before shooting him in the face and then watched as this
"red cloud" flowed out of his face.

The police found Foster's shotgun, a ski mask, gloves,
and a newspaper clipping of the murder in the trunk of
Magnotti's car. According to Burnett, he was directed by
Foster to put those items in Magnotti's trunk. Foster's
fingerprint was found on the shotgun, the latex gloves,
and the newspaper. Burnett and Magnotti's prints were
also found on the newspaper.

Foster's mother, Ruby Foster ("Ms. Foster"), testified
on direct examination that Foster called her from home
at around 4:30 p.m. on the day of the murder. When she
got home that night, at 9 p.m., Foster was there. She
later left the house at about 9:45 p.m., but found Foster
home when she returned a little past 11 p.m. She made
another trip to the Circle K store and returned at about
11:20 p.m. once again to find Foster where she left him.
On cross-examination, however, Ms. Foster admitted that
she merely assumed that Foster was at home when he called
her. Additionally, all the participants in the
conspiracy and the murder testified that when they met
at Foster's home on the night of the murder, no one was
in the home and Foster had to disable the alarm apparatus
upon entering.

All the members of the Lords of Chaos who participated
in the murder and the conspiracy cooperated with the
State through various plea agreements [FN3] and
testified to the above facts at trial against Foster
with regard to the make-up of the group, Foster's
leadership role in the group, criminal acts committed by
the group prior to the murder, and his leadership and

mastermind role in the conspiracy and the ensuing murder. Foster was convicted for the murder of Schwebes.

> FN3. Pursuant to plea agreements with the State which required truthful testimony against Foster, the group members were sentenced as follows: Black and Shields were sentenced to life without the possibility of parole; Magnotti was sentenced to thirty-two years' imprisonment; Burnett was sentenced to two years in county jail for non-homicidal offenses; Torrone was sentenced to one year in county jail, ten years probation, one hundred hours of community service and restitution. As to the other members, the record does not indicate whether there was any plea agreement or any jail or prison sentences.

PENALTY PHASE

During the penalty phase, the State presented one witness. The State's witness, Robert Duram, was the director of student assignment for Lee County and former principal of Riverdale. Duram testified to his knowledge and hiring of Schwebes as band director. He also testified that Schwebes' death was devastating not only to the school, but also to the rest of the student body, whose participation in extra-curricular activities dropped significantly as a result of the tragedy. The school had to bring in numerous counselors to help the students cope with the effects of Schwebes' death.

The defense presented numerous witnesses who presented a picture of Foster as a kind and caring person. May Ann Robinson, Foster's neighbor, testified that he once helped her start her car and offered to let her borrow a lawn mower. Robert Moore, another neighbor, testified that Foster was well-mannered and a hard worker. Shirley Boyette found Foster to be very caring, intelligent, and well-mannered. Robert Fike, Foster's supervisor at a carpentry shop, and James Voorhees, his co-worker, found him to be a reliable worker. Voorhees also testified that Foster was very supportive to Voorhees' son who suffered from and eventually died of leukemia. Similarly, Raymond and Patricia Williams testified that Foster was very nice to their son who suffered from spina bifida. Peter Albert, who is confined to a wheelchair,

related how Foster had helped Albert's mother care for him after his wife died. Foster also helped Albert in numerous other ways, including preparing his meals, fixing things around the house, and helping Albert in and out of his swimming pool.

There was additional testimony that described Foster's involvement with foreign exchange students. Foster was also known to have given positive advice to young children. Foster's sister, Kelly Foster, testified to how he obtained his GED after dropping out of high school and that he obtained a certificate for the completion of an "auto cad" program at a vocational-technical school. Finally, Foster's mother testified that he was born prematurely and suffered from allergies, and that Foster's father abandoned him a month after birth. On cross-examination, many of the witnesses who testified to Foster's kindness admitted that they had not been in contact with him for a number of years.

SENTENCE

The jury recommended that Foster be sentenced to death by a nine-to-three vote. Following a Spencer hearing,[FN4] the trial court found two aggravating factors: (1) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;[FN5] and (2) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.[FN6] Further, the court rejected the statutory mitigator of age-Foster was eighteen at the time of the crime-and attached very little to no weight to some twenty-three nonstatutory mitigators offered by Foster.[FN7] The trial court followed the jury's recommendation and imposed the death penalty. Foster now appeals and raises seven issues for review.

> FN4. Spencer v. State, 615 So.2d 688 (Fla.1993).
>
> FN5. See § 921.141(5)(e), Fla. Stat. (1997).
>
> FN6. See § 921.141(5)(i), Fla. Stat. (1997).
>
> FN7. Even though Foster referred to the 23 mitigators as nonstatutory, the trial court

treated them as statutory pursuant to section 921.141(6)(h), Florida Statutes (1997).

FN8. The seven issues are: (1) his numerous pretrial change of venue motions were improperly denied; (2) the court erred in permitting the State to elicit hearsay testimony of several witnesses; (3) comments of the trial court during the guilt phase demonstrate that the court had prejudged the case; (4) the avoid arrest aggravator should not have been submitted to the jury in the penalty phase; (5) the trial court erred in admitting the charging information at the Spencer hearing; (6) the trial court failed to properly consider the mitigating circumstances and its findings are unclear; and (7) the sentence was disproportionate in comparison to other cases.

Foster v. State, 778 So. 2d 906, 909–12 (Fla. 2000) (hereafter "Foster I"). The Florida Supreme Court upheld Foster's conviction and sentence. Foster did not seek certiorari from the United States Supreme Court.

Foster filed several state post-conviction motions, including two motions to vacate the judgment under Florida Rule of Criminal Procedure 3.850. The postconviction court held an evidentiary hearing only on Foster's claims of ineffective assistance of counsel in the penalty phase of his trial before denying the Rule 3.850 motions. (Exhibit C36, pp. 3674-3701.) The Florida Supreme Court affirmed. Foster v. State, 132 So. 3d 40 (Fla. 2013) (hereafter "Foster II"). Foster did not seek certiorari from the United States Supreme Court.

Foster petitioned for a writ of habeas corpus in this Court on October 16, 2014. At Foster's request, the Court stayed this case to allow the Florida Supreme Court to consider the application of Hurst v. Florida, 136 S. Ct. 616 (2016) on death-sentenced prisoners, and to allow Foster to exhaust claims stemming from Hurst. The Court ultimately reopened the case on November 21, 2019, and Foster filed an amended petition on January 19, 2020. The parties have fully briefed all grounds raised in the amended petition, and it is ripe for review.

## II. Applicable Habeas Law

### a. AEDPA

The Antiterrorism Effective Death Penalty Act (AEDPA) governs a state prisoner's petition for habeas corpus relief. 28 U.S.C. § 2254. Relief may be granted only on a claim adjudicated on the merits in state court if the adjudication:

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This standard is both mandatory and difficult to meet. White v. Woodall, 134 S. Ct. 1697, 1702 (2014). A state court's violation of state law is not enough to show that a petitioner is in custody in violation of the "Constitution or laws

or treaties of the United States."  28 U.S.C. § 2254(a); <u>Wilson v. Corcoran</u>, 562 U.S. 1, 16 (2010).

"Clearly established federal law" consists of the governing legal principles set forth in the decisions of the United States Supreme Court when the state court issued its decision.  <u>White</u>, 134 S. Ct. at 1702; <u>Casey v. Musladin</u>, 549 U.S. 70, 74 (2006) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000)).  Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary to" clearly established federal law if the state court either:  (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. <u>Ward v. Hall</u>, 592 F.3d 1144, 1155 (11th Cir. 2010); <u>Mitchell v. Esparza</u>, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, <u>Brown v. Payton</u>, 544 U.S. 133, 134 (2005); <u>Bottoson v. Moore</u>, 234 F.3d 526, 531 (11th Cir. 2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend

that principle to a new context where it should apply." Bottoson, 234 F.3d at 531 (quoting Williams, 529 U.S. at 406).

When reviewing a claim under 28 U.S.C. § 2254(d), a federal court must remember that any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Burt v. Titlow, 134 S. Ct. 10, 15 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011). "[T]his standard is difficult to meet because it was meant to be." Sexton v. Beaudreaux, 138 S. Ct. 2555, 2558 (2018).

### b. Exhaustion and Procedural Default

The AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless a petitioner has exhausted all means of relief available under state law. Failure to exhaust occurs "when a petitioner has not 'fairly presented' every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." Pope v. Sec'y for Dep't of Corr., 680 F.3d 1271, 1284 (11th Cir. 2012)

(quoting Mason v. Allen, 605 F.3d 1114, 1119 (11th Cir. 2010)). The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state-law claim.  Snowden v. Singletary, 135 F.3d 732, 735 (11th Cir. 1998).

> Procedural defaults generally arise in two ways:
>
> (1) where the state court correctly applies a procedural default principle of state law to arrive at the conclusion that the petitioner's federal claims are barred; or (2) where the petitioner never raised the claim in state court, and it is obvious that the state court would hold it to be procedurally barred if it were raised now.

Cortes v. Gladish, 216 F. App'x 897, 899 (11th Cir. 2007).  A federal habeas court may consider a procedurally barred claim if (1) petitioner shows "adequate cause and actual prejudice," or (2) "the failure to consider the claim would result in a fundamental miscarriage of justice."  Id. (citing Coleman v. Thompson, 501 U.S. 722, 749-50 (1991)).

### c. Ineffective Assistance of Counsel

In Strickland v. Washington, the Supreme Court established a two-part test for determining whether a convicted person may have habeas relief for ineffective assistance of counsel.  466 U.S. 668, 687-88 (1984).  A petitioner must establish:  (1) counsel's performance was deficient and fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defense.  Id.

When considering the first prong, "courts must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Sealey v. Warden, 954 F.3d 1338, 1354 (11th Cir. 2020) (quoting Strickland, 466 U.S. at 689).  And "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Franks v. GDCP Warden, 975 F.3d 1165, 1176 (11th Cir. 2020) (quoting Richter, 562 U.S. at 101).  Thus, a habeas petitioner must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." Id.  This is a "doubly deferential" standard of review that gives both the state court and the petitioner's attorney the benefit of the doubt. Burt, 134 S. Ct. at 13 (citing Cullen v. Pinholster, 131 S. Ct. 1388, 1403 (2011)).

The second prong requires the petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Sealey, 954 F.3d at 1355 (quoting Strickand, 466 U.S. at 694).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.  The critical question on federal habeas review is not whether this Court can see a substantial likelihood of a different result had defense counsel taken a different approach. Mays v. Hines, 141 S. Ct. 1145, 1149 (2021).

- 12 -

All that matters is whether the state court, "notwithstanding its substantial 'latitude to reasonably determine that a defendant has not [shown prejudice],' still managed to blunder so badly that every fairminded jurist would disagree." Id. (quoting Knowles v. Mirazayance, 556 U.S. 111, 123 (2009)).

"An ineffective-assistance claim can be decided on either the deficiency or prejudice prong." Sealey, 954 F.3d at 1355. And "[w]hile the Strickland standard is itself hard to meet, 'establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult.'" Id. (quoting Richter, 562 U.S. at 105).

### III. Analysis

#### a. Ground 1: Whether Foster was denied effective assistance of counsel in the penalty phase

Two attorneys from the Lee County Public Defender's Office represented Foster. Robert Jacobs was lead attorney, and Marquin Rinard was second chair. Jamie Wootton assisted as a paralegal. Foster claims his defense team failed to adequately investigate and present mitigating evidence. The state postconviction court held an evidentiary hearing on this issue. Foster presented the testimony of Rinard, investigator Roberta Harsh, six members of Foster's family, and four experts from the fields of psychology and neurology. The State presented testimony from three rebuttal experts. The state postconviction court denied relief, and Foster

appealed.  The Florida Supreme Court affirmed, addressing each of Foster's subclaims as follows:

### A. Claim that Defense Counsel Abdicated Responsibility for Mitigation

We turn first to Foster's claim that trial counsel abdicated responsibility for the investigation and presentation of mitigation to Foster's mother. Foster argues that "the entire penalty phase was presented as Ms. Foster's version of Kevin's life" and that "[c]ounsel did not question whether her version was, in fact, true." At the evidentiary hearing, Foster presented Roberta Harsh, defense investigator, who testified that the defense team "pulled out all the stops" and used everything at their disposal in representing Foster. Paralegal James Wootton testified that even before the guilt phase began, the defense team knew it had to gear up for the penalty phase due to the overwhelming amount of evidence of guilt.[FN7] Wootton testified that Foster had been evaluated by psychiatrist Dr. Wald early in the case.

> FN7. Wootton testified that his main responsibility was to organize all the trial documents and computerize them into a trial program called "Trial Scout," which ultimately contained thousands of pages of documents.

Dr. Wald, along with neuropsychologist Dr. Masterson who was to work at Dr. Wald's direction, was appointed almost immediately after Foster's arrest. The order of appointment indicated that the experts were to assist counsel in preparing the defense and to make such examinations of Foster and such reports to defense counsel as defense counsel may direct. Wootton testified that, although there was discussion amongst the defense team about whether Foster was mentally ill or abused as a child, the answer was always that he was not. Wootton also testified that the input from the family indicated that there was nothing wrong with Foster and that he was a wholesome, healthy young man who was being framed by his codefendants. Wootton explained that although Foster's mother voiced her opinions about the defense, made suggestions concerning witnesses, and attended about half of the team meetings on the case, it was

Foster himself along with lead counsel Robert Jacobs who
made the decision about the theory of his defense, which
was to present Foster as a good child who deserved to be
saved.[FN8]

> [FN8] Because Foster's lead defense counsel at
> trial, Robert Jacobs, died in 2007, his
> testimony about what mitigation was
> investigated and how strategic decisions were
> made concerning the penalty phase was
> unavailable.

Foster also presented the testimony of defense co-
counsel Marquin Rinard, an assistant public defender
experienced in capital cases. Rinard explained that a
mitigation specialist was not retained, but that the
defense team compiled Foster's school records and many
of his medical records. Rinard saw no written report
from Dr. Wald, who later explained at the evidentiary
hearing that he did not believe he was asked to prepare
a written report. Dr. Wald's patient records were
unavailable because they had been transferred to a
doctor who purchased his practice in 2001 and were then
lost. However, based on billing records Dr. Wald
maintained, he testified that he did do an evaluation of
Foster and, based on his normal practices, that
evaluation would have attempted to discover any
indication of mental or behavioral disorders. In the
mental status examination, Dr. Wald testified, he would
have looked for delusion patterns, indications of
auditory hallucinations, paranoia, cognitive function,
memory, concentration, and issues of judgment. Dr. Wald
explained that his normal practice would also have been
to look for indications of bipolar disorder, manic
characteristics, depression, and suicidal ideations.

Foster's mother provided alibi information for the guilt
phase and provided a long list of possible witnesses for
the penalty phase but, Rinard testified, it was Jacobs
and Foster who decided on the theory of the defense.
Rinard said he felt sure he and Jacobs discussed Foster's
age, emotional level, and progress in school. According
to Rinard's testimony, none of the witnesses that the
defense team contacted provided any information causing
them to suspect that Foster had mental health problems,
and neither of Foster's defense counsel noted any
indication of mental health problems or depression in

their encounters with Foster. In depositions taken by the State of seven of Foster's relatives in Amarillo, Texas, which were attended by a public defender on Foster's behalf, those relatives reported generally that Foster had a normal childhood with a loving mother and extended family. None testified to any abuse of Foster or to any abusive environment in his home. Rinard testified that Jacobs took primary responsibility for both phases of the trial and that, based on the information they had, defense counsel knew they must attempt to humanize Foster at the penalty phase of trial and present him in the best light possible.

In support of the effort to humanize Foster for the penalty phase jury, Rinard testified that the defense team compiled a great deal of information about Foster helping others and being a good person, which they thought was necessary to overcome the negative guilt phase evidence about Foster. The defense discovered incidences in which Foster assisted disabled people in their homes and did yard work for them, and found that Foster was closely involved with people who were terminally ill, all of which was favorable information for the jury. At the penalty phase of trial, the defense presented twenty-four witnesses who were members of Foster's family, friends of the family, childhood friends of Foster, his former employer, and neighbors. Their testimony showed that Foster was a normal and good child loved by family and friends, as well as a helpful, polite, and compassionate teenager.

At the postconviction evidentiary hearing, Foster's older half-sister, Kelly Foster, testified that she assumed lead counsel Jacobs decided what evidence was to be presented in the penalty phase. As to Foster's childhood, Kelly testified that her first stepfather, Kevin Foster's biological father, treated her roughly, but Foster's mother divorced him and the family moved soon after Foster was born.[FN9] She testified that the next stepfather, Brian Burns, was the father figure to her and Foster for the rest of their childhood. Although he had anger issues and had been "physical" with their mother, Burns had been a good father and remained close to the family even after the divorce. After divorcing Burns, Foster's mother married again, to truck driver John Foster, and spent a lot of time on the road with him, leaving the children with relatives. John Foster

later stopped driving a truck and opened a pawn shop. Foster's mother divorced him after she and he had a few "scuffles." Kelly related that other relatives had mental problems. Other family members testified at the evidentiary hearing that there was mental illness in the family. They also related that Foster was a hyperactive child who was clumsy and often had accidents. None of the negative aspects of the family background evidence was reported to the defense team at the time of trial.

[FN9] Kelly Foster's biological father was Ronald Newberry, Ruby Foster's first husband.

Based on the evidence presented, the circuit court denied relief on this claim, finding that defense counsel did not abdicate their responsibility for mitigation to Foster's mother. The court concluded that Foster and lead counsel Jacobs made the decisions regarding mitigation strategy for the case and that Ms. Foster merely provided contact information for possible penalty phase witnesses, suggestions of inconsistencies in the evidence, and questions that she believed should be asked of witnesses. The favorable, humanizing mitigation presented in the penalty phase was the only mitigation that Foster and his counsel determined should be presented. We have recognized that "[c]ompetent defendants who are represented by counsel maintain the right to make choices in respect to their attorneys' handling of their cases" which "includes the right to either waive presentation of mitigation evidence or to choose what mitigation evidence is introduced by counsel." Hojan v. State, 3 So.3d 1204, 1211 (Fla.2009). The court further found that Foster failed to meet his burden to establish the prejudice prong of Strickland. Competent, substantial evidence supports the circuit court's findings and we affirm denial of relief on this claim.

**B. Claim that the Defense Team was Impaired and Disorganized**

Foster next contends that his defense counsel provided ineffective assistance because the defense team was disorganized, confused, and impaired. This claim was also included within the purview of the evidentiary hearing. The circuit court found, after hearing the testimony, that the allegations were unproven. In

denying relief, the court noted testimony that Jacobs, who had Parkinson's disease, was not adversely affected in his representation of Foster by his Parkinson's tremors. Wootton denied seeing any confusion on Jacobs' part and testified that Jacobs could think on his feet and do what needed to be done. He said he was around Jacobs enough to be able to say that Jacobs was not affected by the disease in any way that would have hindered his ability to defend Foster. Defense co-counsel Rinard testified that he never saw Jacobs trembling or confused. The postconviction court stated, "The Court finds their testimony that Mr. Jacobs was not trembling or confused to be more credible than those of other witnesses who were not in close proximity to Mr. Jacobs during trial, or who have a motive for bias against Mr. Jacobs and in favor of Defendant's motion."

In attempting to prove that the defense team was confused, impaired, and disorganized, Foster relies primarily on a book about the murder and trial titled Someone Has to Die Tonight[FN10] by Jim Greenhill which, Foster contends, reported that the defense appeared "confused." Foster also alleges that according to the Greenhill book, jurors who were close to Jacobs throughout trial noticed his tremors and confusion and found it "off-putting." However, Foster did not present testimony at the evidentiary hearing in support of these specific allegations. Foster did present the testimony of Jack Bates, Jr., Foster's biological father, who testified at the evidentiary hearing that Jacobs "would sometimes get I think frustrated, or somewhat confused." The State's objection that the statement called for speculation was sustained. Even if that testimony had been admitted, it would not have proven that the defense team was disorganized, confused, or impaired.

[FN10] Jim Greenhill, Someone Has to Die Tonight (2006).

Foster also argues that paralegal Wootton characterized the defense as "disorganized." Wootton actually testified that when he first started his job with the public defender, the Foster documents were stored in a box and were "more so disorganized than organized." He explained that his job was "to put it all together to prepare—to put it into this [trial] software program." Thus, Wootton's comment about disorganization did not

refer to the defense team generally, just to the documents he was given to organize and computerize for trial preparation—which he testified that he did.[FN11] The circuit court concluded that Foster failed to meet his burden that the defense team was in any way impaired during trial. We agree.

> [FN11] Foster contends that Wootton's testimony was not competent because evidence supplemented into the record after the hearing—a letter written by Wootton—showed that he had a sexual relationship with Foster's mother, Ruby Foster, and told her in the letter that "counsel fucked up." Regardless of the fact that Wootton may have had a relationship with Ruby Foster during the trial and may not have been truthful about that fact when he testified at the hearing, the circuit court correctly found that the totality of the evidence supported the conclusion that the defense team was not confused, disorganized, or impaired.

We reiterated in Clark v. State, 35 So.3d 880 (Fla. 2010), that "[a]s long as the trial court's findings are supported by competent substantial evidence, this Court will not 'substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given the evidence by the trial court.' " Id. at 886 (quoting McLin v. State, 827 So.2d 948, 954 n. 4 (Fla. 2002)); see also Bell v. State, 965 So.2d 48, 63 (Fla. 2007) ("Questions of credibility are left to the determination of the circuit court, and provided there is competent, substantial evidence to support those credibility assessments, we will defer to that court's decision." (citing Archer v. State, 934 So.2d 1187, 1196 (Fla. 2006) ("This Court is highly deferential to a trial court's judgment on the issue of credibility."))). The postconviction court had before it competent, substantial evidence refuting Foster's claim that the defense team was disorganized, confused, or impaired. We will not second-guess the circuit court on its findings based on this evidence or on the court's credibility determinations. For these reasons, the postconviction court did not err in denying Foster's claim and we affirm.

**C. Claim of Deficient Investigation and Presentation of Foster's Background and Mental Mitigation**

In Foster's next claim for which an evidentiary hearing was held, he contends that trial counsel was deficient in the investigation and presentation of Foster's mental health and background mitigation, and that counsel should have sought neuropsychological testing of Foster. The circuit court denied the claims, concluding that trial counsel cannot be found deficient in failing to present negative mitigating information about Foster when none was provided to counsel by Foster, his family, or his friends and where counsel had no reason to believe such negative information existed. The court cited denial of any mental health issues by Foster and his family, and concluded that the "subtle" or "soft" findings of mental issues by Foster's current experts do not cause the court to find any clear indication existed that Foster suffered from organic brain damage or other mental impairments such that trial counsel was obligated to seek neuropsychological testing. The court further found that the evidence and testimony presented at the hearing did not substantiate claims that Foster suffered a history of concussions, which would have been a red flag for possible brain damage or that he had an abusive or troubled childhood. The court found that defense counsel was never advised of any mitigation arising from the conditions of Foster's childhood, and disagreed that the testimony revealed "significant mitigation leads" which defense counsel should have followed. Thus, the circuit court concluded that trial counsel made a reasonable tactical decision not to pursue further mental health investigation after receiving an initial diagnosis that there were no mental health issues and after receiving no indication of mental issues or other childhood mitigation from Foster and his family. Accordingly, the court held that, under the circumstances, it was not unreasonable for counsel to rely on an attempt to humanize Foster for the jury and present only favorable mitigation.

As to prejudice, the circuit court concluded that even if all the information that Foster claims should have been elicited had been presented in the penalty phase, there would be no reasonable probability that the mitigation would have outweighed the aggravation

presented at trial. The court found that the expert
testimony concerning mental impairments and the
testimony concerning Foster's childhood and alcohol
abuse, dementia, and mental illness in extended family
members would not have outweighed the aggravating
circumstances in this case. We agree and conclude that
all the court's findings are supported by competent,
substantial evidence.

Defense co-counsel Rinard testified that in 1996 a
public defender investigator interviewed Foster and
asked him about any suicide attempts, involuntary
commitment, chronic drug or alcohol abuse, seizures,
retardation, or serious head injuries. The record shows
Foster's negative responses to these inquiries. The
interview notes also indicate that Foster did not appear
odd-acting, inattentive, hostile, or argumentative. The
circuit court noted that neither Wootton nor Rinard saw
any indications of depression or mental impairment
during their interactions with Foster. Wootton testified
that the defense team discussed whether any additional
experts needed to be retained, but based on the
examination that was done of Foster early in the case
and based on everything else the defense team had before
it, the decision was made that no further experts needed
to be retained to look into mental health issues, abuse,
neglect, or any other similar mitigation because there
was nothing to support it. Although Foster's half-
sister, Kelly, testified at the evidentiary hearing that
their childhood was tumultuous, with a series of
stepfathers who on occasion were angry and sometimes
rough with their mother, nothing in her testimony
suggested that Foster had an abusive childhood. She also
described Foster as clumsy and said she had seen him
depressed. Other family members testified at the hearing
that Foster and his sister were often left with relatives
and that their home life was unstructured. However, none
of this information was provided to defense counsel at
the time of trial. Rinard testified that the only
information received from family members—many of whom
testified at the penalty phase of trial—described Foster
and his childhood in favorable terms, and that Foster
and his family were resistant to discussing any other
course of mitigation.

In an effort to establish that neuropsychological
testing was indicated, Foster presented several experts

at the evidentiary hearing. Dr. Ernest Bordini testified
that he administered a number of tests to Foster,
including the Halstead-Reitan Battery of tests, the
Wisconsin Card Sort tests, the Stroop Interference
Procedure test, the Luria Battery of tests, and the
Victor Symptom Validity test for malingering. Dr.
Bordini concluded that Foster has a high verbal IQ score
of 137 but a lower performance IQ score of 105, which
Dr. Bordini opined was indicative of right hemisphere
brain weakness. Dr. Bordini also noted that Foster's
birth records showed he suffered respiratory distress at
birth and was hospitalized for about a week. He opined
that this respiratory distress indicated that Foster was
at high risk of having neurological issues. He
characterized Foster's current reports of past head
injuries as concussions, although Dr. Bordini did not
see medical records confirming concussions suffered by
Foster. Dr. Bordini also diagnosed Foster with
depression occurring after incarceration based on
Foster's current reports of depression to Dr. Bordini.
Finally, Dr. Bordini diagnosed Foster with possible
nonverbal learning disorder, possible bipolar disorder,
and antisocial personality disorder. However, the
State's experts, Dr. Leon Prockup and Dr. Michael
Gamache, disagreed that the records showing the
respiratory distress at birth were indicative of
possible brain damage. Dr. Gamache testified that the
hospital records showed Foster suffered common
respiratory distress often seen in newborns when they
lack a "surfactant" on their lungs that enables ease of
breathing immediately after birth. He explained that
this condition is not an indication of lack of oxygen
(hypoxia) or complete lack of oxygen (anoxia). Dr.
Gamache also disagreed that the variance between
Foster's high verbal IQ score and his lower performance
IQ score were indicative of brain damage. He testified
that both scores were above average and not indicative
of impairment. The circuit court found the testimony of
Drs. Prockup and Gamache on these issues to be more
credible.

Dr. Ruben Gur testified that he used the raw data from
Dr. Bordini's neurological testing to produce a "brain
map" that identified areas of Foster's brain which Dr.
Gur said showed frontal lobe impairment that would
affect Foster's ability to plan, to consider long-term
goals, and to make reasoned decisions regarding long-

term consequences. However, Dr. Prockup testified that in his opinion the brain mapping methodology is not accurate or valid and that the algorithm on which the methodology is based was created with insufficient data. Dr. Prockup discovered no publications or articles on this type of brain mapping methodology since 1990. Dr. Gamache testified that, to his knowledge, statistical brain maps such as this are not frequently used by neurologists. He opined that the mapping methodology used by Dr. Gur was not generally accepted in the field of neuropsychology.[FN12]

> [FN12] The brain map which is the subject of Dr. Gur's testimony, based on statistical data and data derived from psychological testing, is to be distinguished from structural or functional brain imaging from an MRI, fMRI, or PET scan of an individual's brain.

Foster also presented Dr. Thomas Hyde, who testified that Foster's facial asymmetry and asymmetrical leg length were "subtle" findings referable to brain damage even though Foster received a perfect score on the "mini" mental state test Dr. Hyde performed on him. Dr. Hyde's conclusion of possible brain damage was also based on the variance between Foster's verbal IQ score and his performance IQ score. Dr. Hyde diagnosed Foster with significant mood disorder, depression, hypomania, and mania based "primarily on self reports." The circuit court concluded that Dr. Hyde's "subtle" findings were speculative at best.

Dr. Sultan, who first evaluated Foster in 2002, diagnosed Foster with possible brain injury due to his respiratory distress at birth. In addition, she opined that Foster was significantly depressed, suicidal, and bipolar. To support her conclusion that Foster was suicidal, Dr. Sultan cited a gunshot wound Foster suffered at age sixteen. Dr. Sultan concluded that it was a suicide attempt primarily based on Foster's insistence that it was accidental while he was cleaning a gun. Similarly, she described Foster's act of jumping off a bridge shortly after release from the hospital as a possible suicide attempt, even though Foster did not describe it as a suicide attempt. The hospital records for treatment of Foster's gunshot wound indicated the wound was accidental and that upon specific inquiry of

Foster and his mother by hospital staff about suicidal thoughts or depression, the response was that there were none. Nothing provided in the evidentiary hearing refuted the fact that the gunshot wound was accidental. Nor was any evidence presented to substantiate speculation that Foster's jump off a bridge soon after he was released from the hospital after his gunshot wound was a suicide attempt. The circuit court found that it "could have been merely a teenage stunt." Dr. Sultan also concluded Foster was depressed based on his reports to her that currently and in his teens he had episodes of depression. However, these self-reports of depression which Foster provided his current experts were not provided to trial counsel, who had no indication that Foster had suffered any episodes of depression. Dr. Gamache also testified that the data relied on by Dr. Sultan did not support her diagnosis that Foster suffered from bipolar disorder.

As to whether defense counsel should have suspected Foster had brain damage or mental impairment based on earlier head injuries, Rinard testified that there were no records of Foster having received concussions. Foster presented no evidence at the hearing to substantiate his experts' speculation that he had suffered concussions as a child. Even Dr. Bordini, who based much of his diagnosis on the assumption that Foster had a history of concussions, conceded on cross-examination that he saw no medical records supporting a history of concussions.

Moreover, Dr. Wald evaluated Foster prior to trial and testified that his standard practice in such examination would be to look for any signs of mental illness or impairments. Neither Rinard nor Wootton detected any obvious mental problems in their interactions with Foster. Nothing in the medical or school records that trial counsel reviewed indicated that further mental evaluation was necessary. Foster and his family members denied there were any mental problems, depression, or suicidal ideations.

In concluding that trial counsel had no basis to suspect that Foster might have mental issues that required investigation, the circuit court cited the testimony at the evidentiary hearing by Ronald Newberry, who also testified at the penalty phase of trial, that Foster was "hyper" but was "just a normal, regular kid." The circuit

court also noted that certain of Foster's extended family members testified at the evidentiary hearing that Foster's grandfather may have suffered from paranoia, his grandmother had dementia, his aunt was paranoid, an uncle had trouble with alcohol, and another aunt committed suicide. However, they did not testify that they had seen any indications of these problems in Foster. The court also found no evidence to support the contention that Foster suffered mentally from the fact that his maternal grandfather essentially disowned his mother after she gave birth to him.

We explained in Jones v. State, 998 So.2d 573 (Fla.2008):

> While we do not require a mental health evaluation for mitigation purposes in every capital case, Arbelaez v. State, 898 So. 2d 25, 34 (Fla. 2005), and "Strickland does not require counsel to investigate every conceivable line of mitigating evidence ... [or] present mitigating evidence at sentencing in every case," Wiggins [v. Smith], 539 U.S. [510], 533 [123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)], "an attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence." [State v.] Riechmann, 777 So. 2d [342], 350 [(Fla. 2000)]. *Where available information indicates that the defendant could have mental health problems, "such an evaluation is 'fundamental in defending against the death penalty.'"* Arbelaez, 898 So. 2d at 34 (quoting Bruno v. State, 807 So. 2d 55, 74 (Fla. 2001) (Anstead, J., concurring in part and dissenting in part)).

Jones, 998 So.2d at 583 (emphasis added); see also Taylor v. State, 87 So. 3d 749, 761–62 (Fla. 2012) (reiterating that when available information indicates the existence of mental health issues, an evaluation is fundamental (citing Jones, 998 So.2d at 583)). In this case, available information did not point to the existence of mental health issues. The Supreme Court in Strickland explained:

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And *when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.*

Strickland*,* 466 U.S. at 691, 104 S. Ct. 2052 (emphasis added); see also Anderson v. State*,* 18 So. 3d 501, 509 (Fla.2009) (rejecting claim that counsel was deficient for failing to uncover prior sexual abuse of defendant where defendant had denied such abuse prior to trial and described his childhood as normal (quoting Strickland*,* 466 U.S. at 691, 104 S. Ct. 2052)).

We agree that Foster did not establish that trial counsel was deficient in failing to discover the information presented at the evidentiary hearing, failing to seek further psychological testing, or failing to present this information during the penalty phase of trial. The experts presented by Foster at the hearing relied in large part on Foster's self-reports of head trauma and depression, although neither Foster nor his mother ever reported that information to the defense team at the time of trial. Nothing in the records presented at the evidentiary hearing substantiated the claim that red flags were raised indicating Foster might have brain damage or other mental impairments. Trial counsel was never given any indication by Foster, his mother, his half-sister, or any of the other relatives or friends who testified at the penalty phase or at the postconviction evidentiary hearing that Foster had a difficult childhood, was witness to any abuse in the

home, had a history of mental illness in the family, was suicidal, or had a history of head trauma.

The circuit court correctly determined that under the facts of this case Foster did not establish that counsel was deficient in failing to pursue further neuropsychological evaluation of Foster and in failing to present mental mitigation at trial. The circuit court concluded that trial counsel made a reasonable tactical decision, based in part on Dr. Wald's evaluation and on other information counsel obtained at the time of trial, not to pursue further neuropsychological evaluation. The court correctly found that the decision is not rendered deficient merely because Foster has now secured other experts who give a more favorable evaluation or diagnosis. We have noted that simply because the defendant "found a new expert who reached conclusions different from those of the expert appointed during trial does not mean that relief is warranted." Dufour v. State, 905 So. 2d 42, 59 (Fla. 2005) (quoting Cherry v. State, 781 So. 2d 1040, 1052 (Fla. 2000)). Under the facts and circumstances of this case, Foster's counsel was not deficient in developing a mitigation strategy that sought to utilize the humanizing information about Foster as a smart, polite, helpful, normal youth who fell in with the wrong crowd and deserved to be spared the death penalty.

Because nothing presented by Foster undermines our confidence in the outcome of the penalty phase proceedings, we affirm denial of relief on these claims.

Foster II, 132 So. 3d at 52-62.

Foster argues the Florida Supreme Court unreasonably applied Strickland when if found the mitigation case Jacobs presented to result from a reasonable strategic decision. For this argument to be successful, Foster must overcome "a strong presumption" that Jacobs' conduct "might be considered sound trial strategy." Strickland, 466 U.S. at 689. Throughout his argument, Foster claims Jacobs turned the investigation over to Ruby Foster and

allowed her to dictate the mitigation strategy and evidence.  But the witnesses with personal knowledge of the innerworkings of the defense team refuted that characterization.  Investigator Roberta Harsh testified that "Mr. Jacobs and Mr. Rinard were totally on this case.  I can't think of anything else we would have done." (Ex. C28 at 2093.)  Paralegal James Wootton directly rejected the claim that the defense team relied entirely on Ruby Foster and testified that "Mr. Jacobs was running that case…He had the ultimate say so in everything that went down."  (Id. at 2132.) According to Wootton and Rinard, the defense team chose the only mitigation strategy supported by evidence.  (Id. at 2315-16, 2249-50.)

No witness testified that Ruby Foster dictated mitigation strategy.  In fact, Kelly Foster felt that while Jacobs relied on Ruby for information about potential character witnesses, he ignored Ruby's input and considered her a nuisance.  (Id. at 2214.) She believed Jacobs decided what evidence would be presented at the penalty phase.  (Id. at 2221).  Every witness agreed that Jacobs was in charge.  The Florida Supreme Court reasonably rejected Foster's claim that his mother improperly controlled the mitigation case.

Foster also claims the Florida Supreme Court unreasonably relied on Wootton's testimony.  He points to a letter Wootton wrote to Ruby Foster after the postconviction evidentiary hearing,

which stated, "Counsel fucked up." (Ex. C28 at 3505). The letter also alluded to a romantic relationship between Wootton and Ruby Foster, contradicting Wootton's testimony that no such relationship existed. Foster also attacks Wootton's credibility based on his criminal history and drug use.

The Public Defender's Office hired Wootton as part of a program to employ people recently released from prison. Though there is no evidence Wootton used drugs between Foster's arrest and sentence, Wootton eventually started using again. He was forced to resign his job, and he ended up back in prison. When counsel for the State talked to Wootton about testifying at the evidentiary hearing, Wootton asked for help resolving an outstanding warrant, and the State declined that request before the hearing.

"Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011). The postconviction court found Wootton's testimony at the evidentiary hearing, "where the Court was able to observe him and his demeaner," credible. (Ex. C28 at 3689). The Florida Supreme Court also relied on Wootton's testimony, despite acknowledging apparent dishonesty about his relationship with Ruby Foster. Foster II, 132 So. 3d at 55 n.11. "Federal habeas courts have 'no license to redetermine credibility

of witnesses whose demeanor has been observed by the state trial court, but not by them.'" Consalvo, 664 F.3d at 845.  Foster fails to overcome the presumption of correctness afforded to the Florida courts.  There is no evidence Wootton lied about anything but his relationship with Ruby Foster.

Foster's argument on this ground is largely based on the premise that Jacobs gave Ruby Foster control of the mitigation case, and to a lesser degree the premise that Wootton was an incompetent witness.  As explained above, neither premise holds up to scrutiny.  Nor does Foster's reliance on DeBruce v. Comm'r, Ala. Dep't of Corr., 758 F.3d 1263 (11th Cir. 2014).  DeBruce's counsel spoke only to DeBruce and his mother while preparing for the penalty phase of his murder trial.  It was not a strategic decision—DeBruce's counsel testified he did not have time to do a more thorough investigation or the funds to hire an investigator. DeBruce, 758 F.3d at 1272.  DeBruce's mother was the only mitigation witness, and she gave "grossly inaccurate testimony" that contradicted counsel's limited investigation.  Yet counsel did not ask DeBruce or his mother about the inconsistencies.  Id. at 1274.  The DeBruce court found the mitigation investigation deficient under Strickland.

The mitigation investigation in Foster's case stands in stark contrast to DeBruce.  The record does not state exactly how many people Fosters' defense team spoke to during the mitigation

investigation, but it was many more than two.  Jacobs used his office's investigation division to gather information, and he obtained school and medical records.  Jacobs and Rinard chose to humanize Foster because that is where the investigation led them. Foster agreed with the strategy, and the team presented twenty-five witnesses to testify in the sentencing hearing.  Unlike in DeBruce, the record here shows that Fosters' defense team conducted a thorough mitigation investigation and chose the strategy most supported by the available evidence.

Jacobs' investigation included frequent consultation with Foster and his family.  Foster now argues that Jacobs relied too heavily on Foster's self-reporting about his mental health and family history, and that Jacobs should have pursued additional neuropsychological testing.  But as the Florida Supreme Court correctly found, "[n]othing in the records presented at the evidentiary hearing substantiated the claim that red flags were raised indicating Foster might have brain damage or other mental impairments."  Foster II, 132 So. 3d at 60.  And the experts who testified for Foster at the postconviction hearing largely based their opinions on self-reports from Foster that contradicted what he told his trial counsel.  Foster has not shown that his trial counsel could have developed the evidence presented at the postconviction hearing without Foster's cooperation.  The Florida

Supreme Court's determination that Foster's trial counsel was not deficient is reasonable under Strickland.

The Florida Supreme Court also found that Foster failed to satisfy the prejudice prong of Strickland:

> Even if counsel erred in failing to discover and present the same evidence presented at the evidentiary hearing, we cannot conclude that "absent the errors, the sentencer—including an appellate court, to the extent that it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. 2052. "In assessing prejudice, 'it is important to focus on the nature of the mental health mitigation' now presented." Dufour, 905 So. 2d at 59 (quoting Rutherford v. State, 727 So. 2d 216, 223 (Fla. 1998)). The nature of the mitigation presented at the evidentiary hearing was not such that it would alter the balance of the aggravators and mitigators in any manner that undermines confidence in the result. In sentencing, the trial court found and gave great weight to the aggravating factors that the murder was committed for the purpose of avoiding or preventing a lawful arrest and that it was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. Even if the evidence now presented by postconviction counsel had been available to the jury and sentencing court, we cannot conclude there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different or that counsel's deficiencies, if any, substantially impair confidence in the outcome of the proceeding. See Lukehart v. State, 70 So. 3d 503, 514 (Fla. 2011).

Foster II, 132 So. 3d at 61.

The Florida Supreme Court described the mitigation evidence Foster presented in the postconviction evidentiary hearing in an excerpt block-quoted above.  In short, all four of Foster's experts testified he had some level of brain damage.  They also

diagnosed Foster with various conditions, including depression, antisocial personality disorder, hypomania, mania, and bipolar disorder.  The State's two experts rebutted the diagnoses of brain damage, depression, and bipolar disorder.  The Florida Supreme Court identified significant weaknesses in the conclusions reached by Foster's experts, including that they were largely based on self-reporting, speculation, and methodology not generally accepted in the field of neuropsychology.  See Foster II, 132 So. 3d at 57–59.

The Florida Supreme Court weighed the mitigation evidence offered at the postconviction hearing and found no reasonable probability it would have tipped the balance of aggravating and mitigating circumstances if it had been presented at sentencing. That is the appropriate test under Strickland, and the Florida Supreme Court applied it reasonably.  The court did not "blunder so badly that every fairminded jurist would disagree." Mays, 141 S. Ct. at 1149.

Ground 1 is denied.

### b. Ground 2: Whether the trial court erred by refusing a change of venue

Foster's trial received a lot of publicity in the national and local media.  As a result, Foster's trial counsel filed seventeen motions to change venue.  Florida precedent provides that in most cases, "the need to change venue should not be

determined until an attempt is made to select a jury." Morris v. State, 233 So. 3d 438, 445 (Fla. 2018) (quoting Henyard v. State, 689 So. 2d 239, 245 (Fla. 1996)).  Following that approach, the trial court declined to change venue pending jury selection. (Ex. A6 at 1003 ("I'll deny the motion.  We'll give it a shot, see what happens.  If we're unable to get [a jury], then we'll make arrangements…we might go to Orlando.")).  The trial court managed to select a jury in the original forum.

Foster raised this ground on direct appeal.  The Florida Supreme Court rejected it based on state and federal precedent:

> A criminal defendant is guaranteed a right to a fair trial by an impartial jury by both our state and federal constitutions. See Singer v. State, 109 So.2d 7, 15 (Fla.1959). We have accordingly provided the following test to determine when a change of venue is necessary to protect a defendant's right:
>
>> The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom.
>
> Rolling v. State, 695 So.2d 278, 284 (Fla.1997) (quoting McCaskill v. State, 344 So.2d 1276, 1278 (Fla.1977)). Once a defendant raises the partiality of the venire, the trial court must make the following two-pronged analysis: "(1) the extent and nature of any pretrial publicity; and (2) the difficulty encountered in actually selecting a jury." Rolling, 695 So.2d at 285. The burden of showing bias and prejudice is upon the defendant. See Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

Of course, the mere existence of some pretrial publicity does not necessarily lead to an inference of partiality. See Farina v. State, 679 So.2d 1151, 1154 (Fla.1996) (citing Bundy v. State, 471 So.2d 9, 19 (Fla.1985)). Rather, the pretrial publicity must be examined in the context of numerous circumstances, including: (1) when it occurred in relation to the time of the crime and the trial; (2) whether the publicity was made up of factual or inflammatory stories; (3) whether the publicity favored the prosecution's side of the story; (4) the size of the community; and (5) whether the defendant exhausted all of his peremptory challenges. See Rolling, 695 So.2d at 285.

Trial courts are also encouraged to attempt to impanel a jury before ruling on a change of venue. See Henyard v. State, 689 So.2d 239, 245 (Fla.1996); Davis v. State, 461 So.2d 67, 69 n. 1 (Fla.1984); Manning v. State, 378 So.2d 274, 276 (Fla.1979). This provides trial courts an opportunity to determine through voir dire whether it is actually possible to find individuals who have not been seriously infected by the publicity. See Rolling, 695 So.2d at 285. If the trial court finds such individuals, a jury is selected. Where the voir dire fails to produce these individuals, the trial court must grant the motion for change of venue. See id.

While there was indeed a great deal of publicity about the case in the local community, applying the principles of law discussed above, we conclude the trial court properly denied Foster's motions for change of venue. We first focus on the nature and impact of the cited articles, and whether the articles were objective and factual in nature or whether they were inflammatory. See Rolling, 695 So.2d at 285 (citing Provenzano v. State, 497 So.2d 1177, 1182 (Fla.1986)).

Foster provided voluminous records of various newspaper articles and television news accounts of pretrial publicity. These included: (1) news stories immediately after Foster's arrest of how Foster and the Lords of Chaos had planned to go to Disney World and kill as many black tourists as possible; (2) an article on May 9, 1996, titled "Kevin Foster Head of Pack" with various references to Foster as a "psychopath," "Opie with a gun," and a "Jekyll-and-Hyde character;" (3) a column

published on March 1, 1998, just two days before trial, titled, "Old Sparky's hot jolt may await Foster" with references to Foster as a "redneck, racist, gun-crazed punk." Another news article reported that a candidate for sheriff had made similar remarks about Foster.

In contrast to the above-cited articles, most of the articles relied upon were not inflammatory. Instead, they reported on the stages and activities of the prosecution and on plea agreements entered into by the other members of the Lords of Chaos. In fact, in one of the articles, Foster's defense counsel was quoted as saying that he had expected the plea agreements and had been preparing for them all along. Some articles focused on Schwebes' life and his contribution to the community. Still, others focused on students' reaction to and coping with the incident and on the state of various programs dealing with teenagers. Many others simply commented on and updated the proceedings in the case. We conclude that the media coverage as a whole did not reach such an inflammatory level to have irreversibly infected the community so as to preclude an attempt to secure an impartial jury.

In United States v. Lehder-Rivas, 955 F.2d 1510, 1524 (11th Cir. 1992), for instance, the media referred to the defendant as a "drug kingpin, narcoterrorist" who was fascinated with the Third Reich. There, the court found that "such publicity, while unfavorable, did not reach the extreme levels required to trigger a finding of presumed prejudice." Id. Yet, the media references in Lehder-Rivas cannot be said to have been less inflammatory than the ones in the instant case. Moreover, of the jurors eventually empaneled in this case, no one indicated any exposure to the more egregious references cited by Foster.

We must also consider the actual timing of the articles. Most were published some two years before the trial actually took place. In Rolling, as pointed out by Foster, we concluded that three and a half years was a significant time in which the tremendous publicity brought out initially by the case may have dissipated in its effect. See Rolling, 695 So. 2d at 287. Similarly, whether the publicity in this case still affected the community after a two-year lapse between the time of the brunt of the media frenzy and the time of trial requires

that we examine the voir dire, as provided for by the second prong of Rolling.

During voir dire, most of the veniremen stated that they had heard something about this case through the media. As in Rolling, however, the court eliminated all those who stated that their fixed opinion would prevent them from reviewing the evidence in a fair manner. Moreover, as in Rolling, the trial court carefully permitted individual voir dire in two phases, first about pretrial publicity, and second about the venire's positions on the death penalty. The jurors who were finally selected all stated without equivocation that they could be fair and set aside what they had heard. See Rolling, 695 So. 2d at 287; Henyard, 689 So. 2d at 246 ("While the jurors had all read or heard something about the case, each stated that he or she had not formed an opinion and would consider only the evidence presented during trial in making a decision."). Most importantly, however, not only did Foster not challenge for cause any of the jurors actually seated, he was also allotted additional peremptory challenges by the trial court in order to ensure that no biased jurors were selected.

Of course, trial courts should approach this issue conservatively and err on the side of excluding a potentially biased juror. In addition, there are instances in which a trial court must grant a change of venue motion despite assurances of impartiality from the jurors. Certain communities may be so small and the residents so close and personally connected to each other that a particular defendant could not get a fair trial in that community in a highly publicized case. However, Lee County, from which Foster's jury was selected, does not appear to be such a place. With a population of 405,637, Lee is the eleventh largest of the sixty-seven counties in this state. See Florida Statistical Abstract 10 (33d ed. 1999). It should be noted that Rolling's sentencing proceedings, which involved the highly publicized murder of five University of Florida students, took place in the university town of Gainesville itself, in Alachua County. Alachua is about half the size of Lee, with a high concentration of students and residents in Gainesville itself. Nevertheless, the trial court successfully selected a jury there. At the end, a jury was also selected in just

> three days here, as opposed to the three weeks it took
> in *Rolling*.
>
> We therefore conclude that, as in *Rolling,* the trial
> court did not abuse its discretion in denying the change
> of venue motions since the circumstances from the record
> do not indicate that the community was so infected by
> the media coverage of this case that an impartial jury
> could not be impaneled, and an impartial jury appears to
> have been actually seated.

Foster I, 778 So. 2d at 912-14.

The Florida Supreme Court's rejection of this claim follows Supreme Court precedent.  A defendant is entitled to a panel of impartial, indifferent jurors, but "[q]ualified jurors need not…be totally ignorant of the facts and issues involved." Murphy v. Florida, 421 U.S. 794, 799-800 (1975).  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Id. at 800 (quotation marks omitted).  The record of voir dire here shows the trial court selected an impartial jury.  The jurors who knew of the charged crime stated they could set that knowledge aside.  As the Florida Supreme Court noted, Foster did not challenge any of the selected jurors for cause.

Foster now challenges the impartiality of one juror, referred to as "Juror M."  At voir dire, Juror M stated she could be fair and impartial despite learning about the case from news media. (Ex. A13 at 71-72).  Foster claims Juror M used pretrial publicity against him because of an excerpt from a book about the case—

<u>Someone Has to Die Tonight</u> by Jim Greenhill.  According to the book, when photos of the crime scene were published to the jury, Juror M thought they were more detailed than what she saw in the newspaper.

Respondent challenges the admissibility of Greenhill's account because Foster did not call him to testify at the evidentiary hearing.  But even setting admissibility issues aside and assuming the account is true, it does not suggest that Juror M was not impartial.  It merely confirms that she read about the case in the newspaper, a fact she acknowledged during voir dire.

The Florida Supreme Court's rejection of this ground was a reasonable application of federal law.  Foster fails to demonstrate that the venue of his trial made it fundamentally unfair.  The record show that the trial court empaneled an impartial jury.  Ground 2 is denied.

### c. Ground 3: Whether juror misconduct denied Foster a fair trial

Foster asserts three claims of juror misconduct.  The postconviction court summarily denied each claim, and the Florida Supreme Court affirmed.

In his first subclaim, Foster points to Juror Q, who stated in voir dire that he had never been charged or convicted of a crime, despite a twenty-four-year-old DUI conviction.  The Florida

Supreme Court rejected this claim because it found no prejudice to

Foster:

> Foster contends in this claim that the trial court erred
> in summarily denying his claim that the State committed
> a Brady violation when it failed to disclose the fact
> that Juror Q had been prosecuted by Lee County
> authorities and convicted of DUI twenty-four years
> earlier. See Brady v. Maryland, 373 U.S. 83, 83 S. Ct.
> 1194, 10 L. Ed. 2d 215 (1963). During voir dire, the
> trial judge asked prospective Juror Q if he had ever
> been convicted of a crime or charged with a crime, to
> which he answered, "No, sir." Juror Q did serve on the
> jury. Foster contends the prejudice which flowed from
> this nondisclosure was that Juror Q may have decided to
> sentence Foster to death based on the juror's past
> experiences with Lee County authorities, which were
> unknown to counsel. Foster contends that the State had
> actual or constructive knowledge of this fact and
> failure to disclose it was a violation under Brady. He
> also contends that the State knowingly presented or
> failed to correct Juror Q's false testimony in violation
> of Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763,
> 31 L. Ed. 2d 104 (1972).
>
> We explained in Lebron v. State, 799 So. 2d 997 (Fla.
> 2001), that "[a] juror's nondisclosure of information
> during voir dire warrants a new trial if it is
> established that the information is relevant and
> material to jury service in the case, the juror concealed
> the information during questioning, and failure to
> disclose the information was not attributable to
> counsel's lack of diligence." Id. at 1014. See also De
> La Rosa v. Zequeira, 659 So. 2d 239, 241 (Fla. 1995)
> (same). More recently, we held that the movant must at
> least allege facts establishing a prima facie basis for
> prejudice. See Hampton v. State, 103 So. 3d 98, 112–13
> (Fla. 2012), cert. denied, --- U.S. ----, 133 S. Ct.
> 2027, 185 L. Ed. 2d 892 (2013). In Hampton, we reiterated
> that the complaining party must establish "not only that
> the non-disclosed matter was 'relevant' ... but also
> that it is 'material to jury service in the case.'"
> Hampton, 103 So. 3d at 112 (quoting Roberts v. Tejada,
> 814 So. 2d 334, 339 (Fla. 2002) (quoting De La Rosa, 659
> So. 2d at 241)).

In Johnston v. State, 63 So. 3d 730 (Fla. 2011), we explained, "There is no per se rule that [a juror's] involvement in any particular prior legal matter is or is not material. Factors that may be considered in evaluating materiality include the remoteness in time of a juror's prior exposure, the character and extensiveness of the experience, and the juror's posture in the litigation." Id. at 738 (citations omitted) (quoting Roberts, 814 So. 2d at 345). Again, in this postconviction context, the movant must establish that the undisclosed information was relevant and material to jury service. Id.[FN15]

> FN15. The postconviction court denied Foster's separate motion to interview Juror Q, finding that "[t]he alleged fact that Mr. [Q] was a defendant in a misdemeanor DUI case would not be material to his service as a juror in a murder trial.... Mr. [Q's] prior criminal case is also not material because it is too remote in time as, according to Defendant, it was 24 years prior to the juror's service."

The claim filed by Foster failed to allege a prima facie basis for concluding that the undisclosed twenty-four-year-old DUI conviction, even if verified, was relevant or material to Juror Q's jury service. Just as we noted in Johnston, "nothing about the character and extensiveness of [the juror's] own experience" in being convicted of a nonviolent offense "suggests [the juror] would be biased against a defendant pleading not guilty in a death penalty case." Johnston, 63 So. 3d at 739.

To the extent that Foster was denied a hearing on his Brady claim that the State knowingly failed to disclose this juror information resulting in prejudice, the claim was correctly summarily denied. In order to establish a Brady violation, the defendant must show that (1) favorable evidence—either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) that because the evidence was material, the defendant was prejudiced. See Rimmer v. State, 59 So. 3d 763, 785 (Fla. 2010) (citing Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)). To meet the materiality prong under Brady, the defendant must "demonstrate a reasonable probability that had the suppressed evidence been disclosed the jury

would have reached a different verdict," a reasonable probability being one sufficient to undermine confidence in the outcome. Rimmer, 59 So. 3d at 785. Foster has not met this test. Even assuming that the State knew or had constructive knowledge of this information and should have disclosed it, the information was not related to guilt or punishment, nor was it exculpatory or impeaching, and nothing set forth in the claim demonstrates it would have been material or favorable to Foster. See Evans v. State, 995 So. 2d 933, 951 (Fla. 2008) (denying Brady claim where information is neither exculpatory nor impeaching); see also Smith v. State, 931 So. 2d 790, 798 (Fla. 2006) (same).

To the extent Foster makes a claim under Giglio that the State knowingly allowed the presentation of false testimony on voir dire, the claim was also properly summarily denied. In order to demonstrate a Giglio violation, "a defendant must show that: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material." Tompkins v. State, 994 So. 2d 1072, 1091 (Fla. 2008) (quoting Rhodes v. State, 986 So. 2d 501, 508-09 (Fla. 2008)). As discussed above, Foster's claim failed to allege facts sufficient to demonstrate that the juror's false statement was material to his jury service and thus prejudicial. For these reasons, the circuit court's summary denial of this claim is affirmed.

Foster II, 132 So. 3d at 62-64.

Foster does not identify any error in the Florida Supreme Court's application of Brady or Giglio, and this Court finds none. Foster argues, however, that the state court erred by ignoring caselaw suggesting that failure to disclose a prior conviction is evidence of bias. To support that proposition, Foster cites United States v. Capra, 271 F.3d 962 (11th Cir. 2001). But the Florida Supreme Court's reasoning mirrors Capra. There, the Eleventh Circuit explained that a defendant is not entitled to a

new trial every time a juror fails to answer a question honestly. The defendant must also show that the dishonesty was material, and that a correct response would have provided a valid basis for a challenge with cause.   _Carpa_, 271 F.3d at 966.   The Florida Supreme Court reasonably found that Juror Q's false statement was not material, so it's rejection of this claim is correct under federal law.

Foster's second subclaim points again to the claim in the Jim Greenhill book that evidence presented at trial reminded Juror M of pretrial coverage.   The Florida Supreme Court rejected this claim:

> In this allegation of juror misconduct, Foster contends that Juror M gave an untruthful response in voir dire about her knowledge of Foster's case gleaned from local media coverage and about her ability to be fair. He contends that despite her assurances that she could be fair, her response was untruthful because at some unknown time she mentally compared photographs she viewed at trial with those she had seen in the newspaper before being empanelled. Foster alleged that he obtained this information from the 2006 book _Someone Has to Die Tonight_. Foster claims that the book reveals Juror M told the author that the photographs shown in court "detailed more than what was in the paper."
>
> Foster's motion conceded that when Juror M was asked on voir dire whether she had acquired any knowledge of the case from local news media, she responded that she had learned about the case from the newspaper and television. When asked if that information would affect her impartiality, she responded that she did not think so. When asked if she could set aside the information that she may have heard or seen in the paper and base her verdict solely on the evidence or the lack of evidence at trial, she said she thought she could.

To the extent that Foster is claiming the information he
learned from the book is newly discovered evidence
entitling him to a new trial, the postconviction court
was correct in summarily denying it. To obtain a new
trial based on newly discovered evidence, the defendant
must show that evidence was not known by the trial court,
the party, or counsel at the time of trial and the
defendant could not have known of it by use of due
diligence. Second, the evidence "must be of such nature
that it would probably produce an acquittal on retrial."
See Johnston v. State, 27 So. 3d 11, 18 (Fla. 2010)
(quoting Jones v. State, 709 So. 2d 512, 521 (Fla.
1998)). Summary denial of a postconviction motion
alleging newly discovered evidence will be upheld if the
motion is legally insufficient or its allegations are
conclusively refuted by the record. McLin v. State, 827
So. 2d 948, 954 (Fla. 2002). The allegations in Foster's
motion concerning Juror M are legally insufficient and
summary denial of this claim was proper.

Even if it is taken as true that Juror M made the alleged
comments to the author concerning the difference between
the photographs in the newspaper and those at trial,
there are no facts set forth that would suggest she made
those same mental comparisons during trial or during her
jury deliberations rather than at some point afterward
when she was interviewed. Even if she mentally noted
during trial that the trial photographs showed more than
the photographs in the newspaper, such does not indicate
that she relied on evidence outside of court or was not
fair and impartial—or most importantly, that she lied
during voir dire when she said she thought she could be
fair. Finally, if she made those mental comparisons
during deliberations, such would inhere in the verdict
and her mental considerations are not subject to
challenge. See Reaves v. State, 826 So. 2d 932, 943 (Fla.
2002). For these reasons, the trial court was correct in
summarily denying this claim that Juror M lied during
voir dire about her prior knowledge of the case and her
ability to be fair.

Foster fails to make clear whether he is raising this
claim as one of newly discovered evidence or whether he
is seeking appellate review of the trial court's denial
of his motion to interview jurors. To the extent that
this claim is an appeal of the trial court's denial of
a jury interview, we conclude that the circuit court's

denial of relief was proper. Foster filed a motion for juror interview pursuant to Florida Rule of Criminal Procedure 3.575 on September 28, 2010, seeking to interview Juror M on the grounds that the Greenhill book reported Juror M's comments about the photographs. A motion for juror interview must set forth allegations that are not merely speculative or conclusory, or concern matters that inhere in the verdict. See State v. Monserrate-Jacobs, 89 So. 3d 294, 296 (Fla. 5th DCA 2012). The postconviction court denied the motion, finding that allegations that Juror M may have compared the evidence presented at trial with her memory of prior news accounts were speculative and conclusory, or were subjective impressions after the jury was discharged, and that the allegations concerned matters that inhered in the verdict itself. The court therefore concluded that the allegations did not allege juror misconduct and the motion to interview was denied.

"A trial court's decision on a motion to interview jurors is reviewed pursuant to an abuse of discretion standard." Anderson v. State, 18 So. 3d 501, 519 (Fla. 2009). Florida Rule of Criminal Procedure 3.575 requires that a party must have reason to believe the verdict may be subject to legal challenge to warrant a juror interview. Juror interviews are not permitted as to matters which inhere in the verdict. See Reaves, 826 So. 2d at 943. Moreover, "[i]n order to be entitled to juror interviews, [a defendant] must present 'sworn allegations that, if true, would require the court to order a new trial because the alleged error was so fundamental and prejudicial as to vitiate the entire proceedings.'" Id. (quoting Johnson v. State, 804 So. 2d 1218, 1225 (Fla. 2001)).

Rule 4-3.5 of the Rules Regulating the Florida Bar also sets limits on an attorney's ability to interview jurors. We have repeatedly held that this rule does not deny a defendant the right to effective assistance of counsel in pursuing postconviction relief. See Reese v. State, 14 So. 3d 913, 919 (Fla. 2009) (noting that the Court has held that neither rule 3.575 nor rule 4-3.5 violates a defendant's constitutional rights); Evans v. State, 995 So. 2d 933, 952 (Fla. 2008) ("Without more substantial allegations of how juror Taylor's single 'yes or no' response prejudiced the entire proceeding, this appears to be a 'fishing expedition' after a guilty

verdict has been returned."). Because the rules are
valid, and because the postconviction motion and the
argument on appeal present only speculative and
conclusory allegations concerning Juror M which, on
their face, fail to provide a reasonable basis for the
court to conclude that the verdict was illegal and that
a juror interview should have been granted, the
postconviction court did not abuse its discretion in
denying Foster's motion to interview jurors. For all the
foregoing reasons, we affirm the circuit court's denial
of this claim.

Foster II, 132 So. 3d at 64-66.  Foster identifies no error in the

Florida Supreme Court's reasoning.  Even accepting as true the

claim that Juror M mentally compared photographic evidence to

pretrial publicity, there is no juror misconduct here.  During

voir dire, Juror M acknowledged that she learned about the case

from media coverage.  That knowledge did not disqualify her, and

Foster did not strike her from the jury.  It would be unreasonable

to expect Juror M to forget what she learned, and there is no

indication she improperly considered that knowledge when

determining Foster's guilt.

The third subclaim contends several jurors inferred Foster's

guilt from his decision not to testify.  Foster again relies solely

on the Greenhill book to support his argument.  The Florida Supreme

Court found the subclaim deficient:

The circuit court also summarily denied Foster's claim
that the jurors violated the trial judge's instruction
that they were to draw no inference of guilt from
Foster's failure to testify. Foster contends that the
jury foreman was quoted in the Greenhill book as saying
that Foster did not give the jury much to go on and that
he "sat emotionless during the whole thing." Citing the

Greenhill book, Foster contends that the jury foreman "thought" Foster should "get up there and set the record straight" and Juror Q "thought" Foster was "like a bump on a log" without emotion. Foster also contends that other jurors, including Juror M, were adamant that Foster should show remorse and that they used lack of remorse as a nonstatutory aggravator.

In the postconviction court's order denying the juror interview, the court stated:

> There does not appear to be any authority which would support Defendant's argument that a motion to interview jurors relying solely upon information culled from news articles or a true crime novel, without the support of sworn facts or record evidence, would be cognizable. There has been no demonstration that the alleged quotes from jurors in the news articles or book were accurate recollections, were the juror's complete statements, were unedited, or were not taken out of context.

For the same reasons set forth above, the circuit court did not abuse its discretion in denying juror interviews relative to this claim. Moreover, Foster's claim focuses solely on the jury's deliberations, something that we have specifically held to be impermissible. See, e.g., Vining v. State, 827 So. 2d 201, 216 (Fla. 2002) ("[T]his Court has cautioned 'against permitting jury interviews to support post-conviction relief' for allegations which focus upon jury deliberations." (quoting Johnson v. State, 593 So. 2d 206, 210 (Fla. 1992))); Reaves, 826 So. 2d at 943 (holding that matters which inhere in the verdict and the jury's deliberations are not subject to challenge). "[A] verdict cannot be subsequently impeached by conduct which inheres in the verdict and relates to the jury's deliberations." Johnson, 593 So. 2d at 210 (quoting Mitchell v. State, 527 So. 2d 179, 181 (Fla. 1988)). This rule of law extends even to allegations that jurors improperly considered a defendant's failure to testify, "a matter which essentially inheres in the verdict itself." Reaves, 826 So. 2d at 943 (quoting Sims v. State, 444 So. 2d 922, 925 (Fla. 1983)).

> Because the allegations were legally insufficient to
> require an evidentiary hearing and because the circuit
> court did not abuse its discretion in denying the juror
> interview, we affirm the circuit court's summary denial
> of this claim.

Foster II, 132 So. 3d at 66-67. Again, Foster identifies no error

in the Florida Supreme Court's reasoning.  Even assuming the

Greenhill book accurately related jurors' statements, Foster

identifies no clearly established federal law that suggests those

statements entitle him to a new trial or any other postconviction

relief.  Nor does he identify any federal precedent suggesting he

was entitled to interview the jurors under the circumstances of

this case.

Foster fails to show that the state court misapplied federal

law when rejecting his juror-misconduct claims.  Ground 3 is

denied.

### d. Ground 4: Whether the trial judge prejudged the case and refused to consider mitigating evidence

Foster claims trial judge Isaac Anderson made a comment during

the guilt phase that revealed prejudice.  The following exchange

occurred after Foster's counsel raised an objection, and the

prosecutor identified two Florida Supreme Court cases that

supported the State's position:

> MR. JACOBS: Judge, we're objecting to this strongly.  I
> think it's highly improper.  If you allowed this tape
> where someone gives a statement for the State and after
> cross-examination play a statement, they could do that
> on every witness.

THE COURT: Okay.

MR. JACOBS: You don't seem very concerned, but I think it's highly improper.

THE COURT: Tell it to the supreme court.  You'll get an opportunity, I believe.

MR. RINARD: I certainly hope the Court's not prejudging our case.

THE COURT: Not for me to make that decision, it's for them. Guilt or innocence.

MR. RINARD: It may not be going to the supreme court, Judge.

THE COURT: Whatever.

(Ex. A20 at 1538-39).  Foster argues the comment shows that Judge Anderson decided before the end of the guilt phase that Foster would be sentenced to death.

On direct appeal, the Florida Supreme Court found this claim procedurally barred and meritless:

> This claim is procedurally barred because Foster failed to make contemporaneous objections at trial to the judge's comments or seek his disqualification.  See J.B. v. State, 905 So. 2d 1376, 1378 (Fla. 1998) (holding that except where a fundamental error exists, to raise an error on appeal, a contemporaneous objection is required at the trial level when the alleged error occurred).

> Nevertheless, having reviewed all the comments cited by Foster, we conclude that neither the cited comments nor the record as a whole show any bias on the part of the trial court. We note, however, that judges should avoid making such comments. As stated in Peek v. State, 488 So. 2d 52 (Fla. 1986), judges must make sure that their conduct and comments do not lead to even the appearance of bias. That standard of conduct is required not merely for the sake of professionalism, but more importantly to

maintain a high level of confidence in our criminal justice system from all parties.

Foster I, 778 So. 2d at 917.

Foster also claims Judge Anderson's sentencing order reveals bias because the judge gave no weight to Foster's age as a mitigating factor. This is a state law issue, and the Florida Supreme Court held that Judge Anderson "properly evaluated Foster's age as a mitigator." Id. at 921. Still, Foster argues Judge Anderson's "vindictive" tenor revealed animus towards Foster.

Foster argues this ground is not procedurally barred because the Florida Supreme Court addressed its merits. But that is not the standard. Federal habeas courts "will not take up a question of federal law in a case if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Cruz v. Arizona, 598 U.S. 17, 25 (2023) (cleaned up). Foster defaulted on this ground because he did not raise a contemporaneous objection to the trial judge's comment or to the "tenor" of the sentencing order. The Florida procedural rule Foster failed to follow was an independent and adequate ground for rejection of this claim. Nor does he argue any exception to procedural default applies here. Ground 4 is procedurally defaulted.

This ground also lacks merit.  The Due Process Clause guaranteed Foster "a fair trial in a fair tribunal, before a judge with no actual bias against him or interest in the outcome of his particular case."  Norris v. United States, 709 F. App'x 952, 957 (11th Cir. 2017) (quoting Bracy v. Gramley, 520 U.S. 899, 904-05 (1997)) (cleaned up).  To obtain postconviction relief, Foster must "prove that 'under a realistic appraisal of psychological tendencies and human weakness, the judge posed a risk of actual bias or prejudgment such that it created an intolerable threat to the guarantee of due process.'"  Id. (quoting Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 886-84 (2009)) (cleaned up).  Foster has not met this standard of proof.

The Florida Supreme Court's rejection of Foster's judicial bias claim is reasonable under federal law.  Judge Anderson's statement was not made in the presence of the jury.  "Many of the concerns about judicial intervention or inappropriate remarks are greatly diminished or even eliminated when the judicial conduct occurs outside a jury's presence."  United States v. Johnson, 503 F. App'x 901, 905 (11th Cir. 2013).  And Foster presents no well-established federal law suggesting that Judge Anderson's comment to defense counsel and the tenor of his sentencing order prove an "intolerable threat to the guarantee of due process."  Caperton, supra.  Ground 4 is denied.

### e. Ground 5: Whether trial counsel failed to adequately challenge ballistic evidence

At trial, the State presented testimony from ballistics expert Bill Hornsby. Hornsby fired test shells from the Mossberg shotgun found in Peter Magnotti's trunk and compared them to two spent shell casings found at the crime scene. Hornsby concluded that based on the marks left on the shells—which he likened to fingerprints—the spent shells found at the scene had been chambered in and extracted from the shotgun. (Ex. A20 at 1422-23). Hornsby acknowledged he could not say whether the shells had been fired in the weapon. (Id.) Foster claims his attorneys should have challenged the admissibility of Hornsby's testimony and hired an expert to refute his methodology.

The postconviction court summarily denied this ground. The Florida Supreme Court affirmed because Foster's postconviction motion was facially deficient:

> Foster's motion did not specify how his hypothetical expert would raise doubts about the testing Hornsby did. Even if defense counsel could have presented expert testimony that other tests existed which could have been performed, Foster's allegations do not explain how those other tests would have resulted in a conclusion that the shells found at the scene were not at one time chambered in and ejected from Foster's shotgun. Finally, even if trial counsel were somehow deficient in failing to present its own ballistics expert, Foster has not explained what prejudice flows from that deficiency. As noted earlier, in order to prove prejudice under the second prong of Strickland, a defendant must show that, but for counsel's deficiency, there is a reasonable probability that there would have been a different outcome, a reasonable probability being one sufficient

to undermine confidence in that outcome. See Simmons v. State, 105 So. 3d 475, 487–88 (Fla.2012). In this case, the facts set forth by Foster in his motion and in his claim on appeal fail to show that, but for trial counsel's alleged deficient conduct in failing to present a ballistics expert, there is a reasonable probability of a different outcome such that our confidence is undermined. Thus, the circuit court correctly denied this claim.

. . .

Foster also contends that the postconviction court erred in summarily denying his claim that trial counsel was ineffective for failing to request a Frye hearing to test the expert ballistic testimony concerning the source of the spent shotgun shell casings found at the scene. The court in Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923), held that before scientific evidence is generally admissible, it must be based on methodology that is sufficiently established to have gained general acceptance in the particular field in which it belongs. See id. at 1014.

There is no question that "tool-mark identification in the context of ballistics has been used in the criminal context since at least 1929, and in Florida since at least 1937." King v. State, 89 So. 3d 209, 228 (Fla.2012). In King, we held that tool mark examination in ballistics has been a well-documented methodology over the last century and is not new or novel. Id. We also note that in Commonwealth v. Whitacre, 878 A.2d 96 (Pa. Super. Ct. 2005), the Superior Court of Pennsylvania was presented with the issue of tool mark testimony concerning spent shotgun shells found at the scene of a crime, which were then compared with test-fired shotgun shells. In that case, a Frye hearing was held on the evidence presented by the firearm and tool mark examiner, who had determined by use of a comparison microscope that the spent shells had been discharged from a particular shotgun. Id. at 100-01. The appellate court concluded that the comparison methodology used on the shotgun shells had been in use since the 1930s, is a methodology that is accepted by the Association of Firearm and Tool Mark Examiners, and was neither new nor original. Id. at 101.

> Because tool mark examination in ballistics, which was
> employed by the State's expert in this case, is not a
> new or novel methodology, Foster's trial counsel was not
> deficient in failing to demand a Frye hearing before
> admission of the testimony. In addition, because
> Foster's claim is conclusory and unspecific, and fails
> to allege any facts that support his allegation that the
> tool mark and firearms testimony by Hornsby was
> unreliable, the postconviction court did not err in
> summarily denying this claim.

Foster II, 132 So. 3d at 68-69.

The Florida Supreme Court did not misapply Strickland. Because the postconviction court summarily denied this ground, Foster had no chance to substantiate his speculation about the testimony of a ballistic expert hired by the defense. But even if he could present expert testimony to undermine Hornsby's conclusion, the Florida Supreme Court reasonably found no prejudice. The State presented ample evidence that Foster used the Mossberg shotgun to kill Mark Schwebes even without Hornsby's testimony. Peter Magnotti and Christopher Black identified the shotgun and the shell casings used to kill Schwebes, and Derek Shields identified the gun but not the shells. (Ex. A18 at 1111-13; A20 at 1300-02, 1471). Black and three other witnesses also testified that Foster bragged about shooting Schwebes with the shotgun. (Ex. A18 at 1187, 1307; Ex. A19 at 1207-08, 1255).

Foster fails to show how excluding or undermining Hornsby's testimony would have helped his defense. While Hornsby testified that he could not say the shells were fired from the shotgun, his

conclusion allows the inference that the shotgun was the murder weapon.  That is consistent with Foster's defense theory—that his friends killed Schwebes framed him for the murder.  In his closing argument, Jacobs highlighted that the shotgun used to kill Schwebes was found in Magnotti's trunk.  (Ex. A22 at 1821).

The Florida Supreme Court reasonably found no prejudice. There is no reasonable likelihood that the exclusion of Hornsby's testimony would have changed the outcome of this case.  Ground 5 is denied.

### f. Ground 6: Whether trial counsel failed to effectively object to the avoid-arrest aggravator

The Florida capital sentencing statutes provides the following aggravator: "The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody."  Fla. Stat. § 921.141(6)(e).  The trial court applied this aggravator over Foster's objection.  On direct appeal, the Florida Supreme Court explained why it was proper under state law:

> We conclude that the State presented sufficient evidence that Foster and his friends committed the killing for the purpose of avoiding arrest for their prior crimes. As argued by the State, the members of the group directly testified that once Schwebes told Black and Torrone he would report them to campus police the next morning, the group decided that Schwebes had to die that night. In Fotopoulos v. State, 608 So. 2d 784 (Fla. 1992), upon which the trial court relied, the dominant reason why the victim was killed was because of his knowledge of the defendant's alleged involvement in counterfeiting activities. We found that sufficient to support this

aggravator. See id. at 792. Here, Schwebes was aware of the act of vandalism committed that night at Riverdale. With regard to Foster's argument that Schwebes may not have actually seen him that night as he ran from the auditorium, the State established that Foster was concerned that he would ultimately be implicated should either Black or Torrone get arrested. We therefore conclude that the trial court properly submitted and relied upon this aggravator in the sentencing phase.

Foster I, 778 So. 2d at 918.

Despite defense counsel's objection to the avoid-arrest aggravator and the Florida Supreme Court's ruling that it was properly applied, Foster raised the issue as an ineffective-assistance claim in postconviction proceedings. The state postconviction court denied it, and the Florida Supreme Court affirmed:

> The circuit court's order found that the trial transcript refutes this claim because trial counsel did challenge the aggravators. We agree. Defense counsel argued in the charging conference that "[d]uring this penalty phase the State has not offered any evidence of any aggravators, nor did it request of the court to take judicial notice, or to instruct the jurors of anything that happened during the guilt phase.... We're asking the Court at this time to instruct the jury that the only recommendation that they can come back with at this point in time is a recommendation of life, since the State has not presented any type of evidence." Defense counsel also argued to the trial court that there was no evidence presented during the guilt phase to support the avoid arrest aggravator. He argued that the evidence only showed that Schwebes was going to report the incident to the school resource officer, not to law enforcement. Defense counsel further argued to the trial court that there was no evidence there was going to be an imminent arrest or anything other than a school reprimand.

> Defense counsel argued to the penalty phase jury that the State failed to prove the avoid arrest aggravator because there was no evidence that avoiding arrest was the dominant factor in the murder, noting that it was Black and Torrone who were caught on the scene by Schwebes, not Foster, and that Schwebes only said he would contact the school resource officer. Moreover, Foster argued in his direct appeal that the trial court erred both in finding and submitting the avoid arrest aggravator to the jury. See Foster, 778 So. 2d at 918. We rejected the claim, concluding that the evidence supported the avoid arrest aggravator and stating, "[T]he State established that Foster was concerned that he would ultimately be implicated should either Black or Torrone get arrested. We therefore conclude that the trial court properly submitted and relied upon this aggravator in the sentencing phase." Id.
>
> Because Foster's allegations of ineffective assistance in regard to the avoid arrest aggravator are merely conclusory, are conclusively refuted by the record, and raise matters already presented on direct appeal, the postconviction court correctly denied this claim.

Foster II, 132 So. 3d at 61-62.

The Florida Supreme Court correctly applied Strickland. Foster identifies no meritorious argument Jacobs could have but did not make, so there is no basis on which Jacobs could be found deficient. And there was no prejudice because objections to the avoid-arrest aggravator were futile. Federal habeas courts "must defer to the state's construction of its own law" when an attorney's alleged failure turns on state law. Pinkney v. Sec'y, DOC, 876 F.3d 1290, 1295 (11th Cir. 2017) (quoting Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984)). Such deference is especially important when considering Strickland claims because they can "drag federal courts into resolving questions of state

law." Shinn v. Kayer, 141 S. Ct. 517, 523 (2020). This Court thus accepts as correct the Florida Supreme Court's ruling that the avoid-arrest aggravator applied here.

Foster fails to establish either prong of Strickland. Ground 6 is denied.

### g. Ground 7: Whether the trial court shifted the burden of proof to Foster at sentencing

Foster argues two statements made in the sentencing phase of his trial—one by the prosecutor and one by the trial court—shifted the burden of proof to him. During the State's closing argument, the prosecutor said,

> In other words, our law says if the evidence proves that these aggravating circumstances are there, then it is appropriate for a recommendation, that is, you may find and recommend to the judge the death penalty in this case, which he will give great weight to and make the final decision. This is unless these aggravators are outweighed by the mitigating evidence that you have seen in this case.

(Ex. A23 at 2053-54). The trial court then gave the following instruction:

> If you find the aggravating circumstances do justify the death penalty, your advisory sentence should be one of life imprisonment without the possibility of parole. Should you find sufficient aggravating circumstances do exist, it will then be your duty to determine whether mitigating circumstances exist that outweigh the aggravating circumstances.

(Ex. A23 at 2109).

Foster first raised his burden-shifting argument in his state postconviction motion.   The Florida Supreme Court found it procedurally barred and noted that it lacked merit:

> To the extent that Foster is attempting to make a substantive challenge that the instructions shifted the burden, separate and apart from any claim of ineffective counsel, that claim is barred in postconviction proceedings. See Stewart, 37 So. 3d at 262 ("Stewart's substantive challenge to the jury instructions is procedurally barred because it could have been raised on direct appeal.").FN19 As noted above, we held in Chavez that the claim of burden shifting that Foster raises here is without merit. See Chavez, 12 So. 3d at 214; see also Serrano v. State, 64 So. 3d 93, 115 (Fla. 2011) ("This Court has also rejected the claim that the jury instructions unconstitutionally shift the burden of proof."); Schoenwetter v. State, 931 So. 2d 857, 876 (Fla. 2006) ("This Court and the United States Supreme Court have repeatedly found that the standard jury instructions, when taken as a whole, do not shift the burden of proof to the defendant."). For these reasons, the postconviction court correctly denied this claim.

> > FN19.   Foster's brief does not allege ineffective assistance of counsel in this claim, but had he done so it would lack merit. Our precedent is clear that counsel cannot be deemed ineffective for failing to raise a meritless claim. See, e.g., Troy v. State, 57 So. 3d 828, 843 (Fla. 2011).

Foster II, 132 So. 3d at 76.

As in Ground 4, Foster argues this ground is not procedurally barred because the Florida Supreme Court addressed its merits. But, again, that is not the standard.  Federal habeas courts "will not take up a question of federal law in a case if the decision of the state court rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment." Cruz,

598 U.S. at 25 (cleaned up).  Foster failed to preserve this argument by making a contemporaneous objection to the prosecutor's statement or the jury instruction.  The Florida procedural rule Foster failed to follow was an independent and adequate ground for rejection of this claim.  Foster does not argue otherwise.  Nor does he argue any exception to procedural default applies here. Ground 7 is procedurally defaulted.

### h. Ground 8: Whether there was cumulative error

Foster argues he was denied a fundamentally fair trial due to the cumulative effect of errors in his trial.  The Florida Supreme Court rejected this claim in its postconviction review:

> On direct appeal, this Court did find several errors in improper admission of hearsay, which we held were harmless.  However, because we find no error has been demonstrated in this appeal that can be considered cumulatively with any other errors, relief is denied on this claim.

Foster II, 132 So. 3d at 74.

The Florida Supreme Court's rejection of this ground is consistent with the federal cumulative-error doctrine, which "provides that an aggregation of non-reversible errors…can yield a denial of the constitutional right to a fair trial, which calls for reversal."  Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012).  Federal habeas courts "address claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that we find in the

aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." Id.

Foster did not present any successful claim in his state postconviction motion, so the Florida Supreme Court properly denied his cumulative-error claim.  Likewise, none of Foster's preceding federal habeas claims had any merit, so there is no error to accumulate.  Ground 8 is denied.

### i. Ground 9:  Whether Foster's death sentence is proportionate

Foster asserts the Florida courts failed to conduct a proper proportionality analysis.  He argues a proper analysis would show that his sentence is not proportional when compared with defendants in other cases.  Foster also argues he is no more culpable than his codefendants, so he should not receive a harsher sentence.  The Florida Supreme Court rejected both prongs of Foster's proportionality claim:

> Due to the uniqueness and the finality of death, we address the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So. 2d 1060, 1064 (Fla. 1990).  To ensure uniformity in the imposition of the death sentence, we review and consider all the circumstances in a case relative to other capital cases.  See Terry v. State, 668 So. 2d 954, 965 (Fla. 1996); Tillman v. State, 591 So. 2d 167, 169 (Fla. 1991) ("[P]roportionality review is a unique and highly serious function of this Court, the purpose of which is to foster uniformity in death-penalty law.").

> Here, the trial court found two serious aggravators (avoid arrest and CCP), no statutory mitigators and some nonstatutory mitigators. The trial court accorded great weight to both aggravators and assigned very little

weight to the mitigators proposed by Foster. As discussed above, the avoid arrest aggravator was proven beyond a reasonable doubt.

Although Foster does not challenge the CCP finding, a brief analysis of the aggravator is appropriate. In essence this aggravator applies to an execution-style killing that has been calmly and coldly planned in advance. As an example, we have found CCP where a defendant "told others in prison that when he got out he was going to kill the victim; told [someone] that he was going to escape, get his shotgun, kill the first person he saw, steal the person's vehicle, and leave the area; concealed himself in the victim's barn and waited for him; and then kidnapped and murdered the victim and stole his truck." Monlyn v. State, 705 So. 2d 1, 6 (Fla. 1997). Accordingly, to establish CCP:

> [T]he jury must first determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.

Woods v. State, 733 So. 2d 980, 991 (Fla. 1999) (quoting Gordon v. State, 704 So. 2d 107, 114 (Fla. 1997)). To avoid any confusion with the premeditation element required to prove first-degree murder, the trial court is required to instruct and emphasize to the jury that CCP involves a much higher degree of premeditation.

This case appears to present a classic case of a cold and ruthless execution-style killing by a group of young men who knew exactly what they were doing. The sentencing order and the record reveal that Foster and the group carefully planned the killing of Schwebes. To begin, Foster and the group discussed several alternatives before ultimately choosing Foster's plan. Foster got his shotgun and replaced the birdshot it carried with the more lethal #1 buckshot to ensure Schwebes' death. Foster and the group then obtained gloves and ski masks

to hide their identities. Each member of the group had
a specific assignment as directed by Foster. Finally,
Foster looked Schwebes right in the eye before shooting
him in the face and the buttock. These facts strongly
support the finding of CCP, as found by this Court in
somewhat similar circumstances. See Bell v. State, 699
So. 2d 674, 677 (Fla. 1997).

Recently, we affirmed the imposition of a death sentence
upon an eighteen-year old where the trial court found
three aggravators (HAC, CCP, and commission during a
robbery), one statutory mitigator (age of eighteen), and
a number of nonstatutory mitigators. See Nelson v.
State, 748 So. 2d 237 (Fla. 1999). Similarly, we conclude
the death penalty is not disproportionate here in light
of the presence of two strong aggravators and the absence
of statutory and nonstatutory mitigators. See, e.g.,
Davis v. State, 703 So. 2d 1055, 1061-62 (Fla. 1997)
("Where there are one or more valid aggravating factors
that support a death sentence and no mitigating
circumstances to weigh against the aggravating factors,
death is presumed to be the appropriate penalty.")
(quoting Blanco v. State, 452 So. 2d 520, 526 (Fla.
1984)); Sliney v. State, 699 So. 2d 662, 672 (Fla. 1997)
(finding the death penalty proportional with the
existence of two aggravators (commission during a
robbery and avoid arrest), two statutory mitigators (age
and lack of criminal history), and a number of
nonstatutory mitigators); Hayes v. State, 581 So. 2d
121, 126-27 (Fla. 1991) (upholding the death penalty
where there were two aggravators (CCP and commission
during a robbery), one statutory mitigator (age), and
other nonstatutory mitigators).

Foster also points out that he was the only one sentenced
to death out of the four participants in the crime,
further arguing the disproportionality of his
sentence.FN9 While a death sentence is not
disproportionate per se because a codefendant receives
a lesser punishment for the same crime, especially when
he is less culpable, see Hannon v. State, 638 So. 2d 39
(Fla. 1994), we agree the sentence of an accomplice may
indeed affect the imposition of a death sentence upon a
defendant. See Gafford v. State, 387 So. 2d 333, 337
(Fla. 1980); Salvatore v. State, 366 So. 2d 745, 751
(Fla. 1978). However, we have found with some limited
exceptions that the defendant who actually plans and

kills the victim is usually the most culpable, and his death sentence will not be considered disproportionate in comparison to his codefendants' lesser sentences. See Sliney, 699 So. 2d at 672 (death sentence not disproportionate because defendant was more culpable than codefendant); Cook v. State, 581 So. 2d 141, 143 (Fla. 1991) (defendant's death sentence was not disproportionate to sentences of his accomplices, whose level of participation in murder was clearly less than defendant's, and where it was defendant, not his accomplices, who killed victims). Here, the record reveals that Foster was the dominant person in the crime, he planned the killing, assigned the various tasks to the participants, procured the shotgun and the ammunition, and actually shot and killed Schwebes. Under these circumstances we conclude the death penalty is not disproportionate.

> FN9. We note that immediately before jury selection, Foster turned down a plea offer of life without parole on the murder count:
>
> [State]: Yesterday afternoon I did contact Mr. Jacobs at the public defender's office and we did extend an offer in this case of life imprisonment ... That offer I guess up until this time is still open. However, it's my understanding that he would be rejecting that.
>
> [Defense counsel]: I spoke to my client last night upon receipt of the offer at the jail. I told him I wanted to [sic] him to sleep on it. I talked to him this morning, and it's my understanding that he is turning down the offer; is that correct, Kevin?
>
> [Foster]: Yes, sir.
>
> [Defense counsel]: Do you understand that if you accepted the State's offer the case will be over today and you will receive a sentence of life without parole; you understand that?
>
> [Foster]: Yes.

> [Defense counsel]: The State would be willing to waive the death penalty at this point in time.
>
> [Foster]: I understand that.
>
> [Defense counsel]: And knowing all those facts, is it your decision to turn down the State's offer?
>
> [Foster]: Yes, it is.
>
> [State]: At this point the offer will be withdrawn.

Foster I, 778 So. 2d at 921-23.

This ground does not present a cognizable federal habeas claim. The federal constitution does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 50-51 (1984) ("There is no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it."). If that is not clear enough, the Eleventh Circuit has expressly instructed district courts not to conduct proportionality reviews. Mills v. Singletary, 161 F.3d 1273, 1282 (11th Cir. 1998). Ground 9 is denied.

### j. Ground 10: Whether the jury made the findings of fact necessary for the death penalty

This is the first of three grounds first presented in Foster's Amended Petition. Respondent argues these new grounds are barred by the AEDPA's one-year statute of limitations. Foster counters with two alternative theories: (1) the trigger date for the new

claims was the discovery of the underlying factual predicates, not the date Foster's conviction became final; and (2) the Amended Petition relates back to the original petition.

Title 28 U.S.C. § 2244(d) is the AEDPA's statute of limitation.  For most habeas claims, the limitation period begins on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  Foster argues the trigger date for his new claims was "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D).  He claims the factual predicates for Grounds 10 and 11 are the United States Supreme Court's decision in Hurst v. Florida, 136 S. Ct. 616 (2015), the Florida Supreme Court's decision in Hurst v. State, 202 So. 3d 40 (Fla. 2016), and the Florida legislature's enactment of Chapter 2017-1.

Neither Hurst opinion constitutes a "factual predicate" of Foster's claims under § 2244(d)(1)(D).  Nor does the enactment of Chapter 2017-1.  The triggering provision codified as § 2244(d)(1)(D) "depends on presenting newly discovered evidence[,]" not newly enacted or clarified law.  Frederick v. McNeil, 300 F. App'x 731, 733 (11th Cir. 2008) (emphasis added).  The Hurst decisions are not "facts subject to proof or disproof[,]" and Foster does not purport to present them as evidence.  Lo v.

Endicott, 506 F.3d 572, 575 (7th Cir. 2007).  Moreover, accepting court decisions with no evidentiary value in this case as "factual predicates" under § 2244(d)(1)(D) would render § 2244(d)(1)(C)— "the primary vehicle through which court decisions restart the limitations period"—meaningless.  Id. at 575-76.  Section 2244(d)(1)(D) does not apply to Grounds 10 and 11, so they are timely only if they relate back to his original petition.

Federal Rule of Civil Procedure 15 governs amendment of habeas petitions.  See 28 U.S.C. § 2242 (An application for a writ of habeas corpus "may be amended or supplemented as provided in the rules of procedure applicable to civil actions.").  "An amendment to a pleading relates back to the date of the original pleading when…the amendment asserts a claim…that arose out of the conduct, transaction, or occurrence set out…in the original pleading[.]"  Fed. R. Civ. P. 15(c).  In the habeas context, an amended claim does not relate back just because it arose from the same trial, conviction, or sentence as the original petition.  Mayle v. Felix, 545 U.S. 644, 664 (2005).  Rather, the amended claims must be "tied to a common core of operative facts[.]"  Id.

Mayle and cases cited therein illustrate the limits of the "relation back" doctrine in the habeas context.  In Mayle, the petitioner timely asserted that the trial court violated the Confrontation Clause of the Sixth Amendment by publishing a witness's videotaped statement to the jury.  Id. at 650.  An

amended petition asserted a Fifth Amendment self-incrimination claim arising from admission of the petitioner's pretrial statements to the police.  Id. at 651.  The Supreme Court rejected the petitioner's claim that the trial itself was the "transaction" or "occurrence" relevant for relation-back purposes.  The Fifth Amendment claim did not relate back to the Sixth Amendment claim because the claims "targeted separate episodes" that were "different in time and place[.]"  Id. at 659.  Compare that with two cases the Supreme Court cited of examples of the "relation back" doctrine at work:

> [I]n Mandacina v. United States, 328 F.3d 995, 1000–1001 (C.A.8 2003), the original petition alleged violations of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), while the amended petition alleged the Government's failure to disclose a particular report. Both pleadings related to evidence obtained at the same time by the same police department. The Court of Appeals approved relation back. And in Woodward v. Williams, 263 F.3d 1135, 1142 (C.A. 10 2001), the appeals court upheld relation back where the original petition challenged the trial court's admission of recanted statements, while the amended petition challenged the court's refusal to allow the defendant to show that the statements had been recanted. See also 3 J. Moore, et al., Moore's Federal Practice § 15.19[2], p. 15–82 (3d ed. 2004) (relation back ordinarily allowed "when the new claim is based on the same facts as the original pleading and only changes the legal theory").

Id. at 664 n.7.

In Ground 10 of his Amended Petition, Foster claims his death sentence violates the Eighth and Fourteenth Amendments' prohibitions against arbitrary and capricious imposition of the

death penalty because the jury did not unanimously recommend the death penalty.  Foster argues the claim relates back because his original petition challenged the reliability of the death sentence, thereby putting the State on notice of the factual basis of Ground 10.  But the pleading standard that applies to habeas cases requires more than fair notice.  Id. at 655.  A habeas petition "must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" Id. (quoting Habeas Corpus Rule 2(c)).  It is not enough that the original petition gave Respondent fair notice of Ground 10's factual basis.  And because none of Foster's timely habeas claims were based on the non-unanimous nature of the jury's death recommendation, Ground 10 does not relate back.  It is thus untimely.

Even if Foster timely filed Ground 10, it would not warrant federal habeas relief.  The Florida Supreme Court denied it because under Florida law, Hurst v. State and Hurst v. Florida do not apply retroactively to Foster's sentence.  Foster v. State, 235 So. 3d 294, 295 (Fla. 2018) (hereafter "Foster III").  In Hurst v. Florida, 577 U.S. 92 (2016), the Supreme Court extended its decision in Ring v. Arizona, 536 U.S. 584 (2002) to Florida's capital sentencing scheme and held that Florida's scheme violated the Sixth Amendment.  The Hurst Court summarized the pre-Hurst

sentencing procedure Florida courts used after a defendant was
convicted of a capital crime:

> The additional sentencing proceeding Florida employs is
> a "hybrid" proceeding in which a jury renders an advisory
> verdict but the judge makes the ultimate sentencing
> determinations. First, the sentencing judge conducts
> an evidentiary hearing before a jury. Next, the jury
> renders an advisory sentence of life or death without
> specifying the factual basis of its recommendation.
> Notwithstanding the recommendation of a majority of the
> jury, the court, after weighing the aggravating and
> mitigating circumstances, shall enter a sentence of life
> imprisonment or death. If the court imposes death, it
> must set forth in writing its findings upon which the
> sentence of death is based. Although the judge must
> give the jury recommendation great weight, the
> sentencing order must reflect the trial judge's
> independent judgment about the existence of aggravating
> and mitigating factors.

Hurst v. Florida, 577 U.S. 92 at 95-96 (2016) (internal quotation
marks and citations omitted). The Supreme Court found it
unconstitutional because it required a judge, rather than a jury,
to make the critical factual findings necessary to impose the death
penalty—i.e., the existence of aggravating circumstances. Id. at
98.

On remand of Hurst, the Florida Supreme Court went a step
further. Along with the existence of aggravating circumstances,
it held that a "jury must also unanimously find that the
aggravating factors are *sufficient* for the imposition of death and
unanimously find that the aggravating factors *outweigh* the
mitigation before a sentence of death may be considered by the
judge." Hurst v. State, 202 So. 3d 40, 54 (Fla. 2016). The court

based its heightened protection in part on Florida law and in part on its understanding that "Hurst v. Florida mandates that all the findings necessary for imposition of a death sentence are 'elements' that must be found by a jury[.]" Id. at 57.

The Florida Supreme Court has since recognized that it "erred in Hurst v. State when [it] held that the Eighth Amendment requires a unanimous jury recommendation of death." State v. Poole, 297 So. 3d 487, 504 (Fla. 2020) (citing Spaziano v. Florida, 468 U.S. 447 (1984)). The court receded from Hurst v. State "except to the extent that it held that a jury must unanimously find the existence of a statutory aggravating circumstance beyond a reasonable doubt." Id. at 491.

Foster mounts two attacks on the Florida Supreme Court's denial of his Hurst claim. First, he argues Florida's retroactivity approach violates the Eighth and Fourteenth Amendments' prohibition against arbitrary and capricious imposition of the death penalty. In Asay v. State, 210 So. 3d 1 (Fla. 2016), the Florida Supreme Court held that Hurst should not be applied retroactively to cases that became final before Ring. Later that year, the court decided to apply Hurst to defendants sentenced to death after Ring. Mosley v. State, 209 So. 3d 1248, 1283 (Fla. 2016).

Florida is free to "make its own choice about the retroactivity of a given case as a matter of state law." Knight

v. Fla. Dep't of Corr., 936 F.3d 1322, 1333 (Fla. 2019).  And
"that state-law retroactivity determination has no significance in
federal court."  Id.  Florida's retroactivity rule is an adequate
and independent state law basis for the denial of Foster's Hurst
claim.  Thus, this Court cannot grant habeas relief.  Coleman v.
Thomas, 501 U.S. 722, 729 (1991) ("This Court will not review a
question of federal law decided by a state court if the decision
of that court rests on a state law ground that is independent of
the federal question and adequate to support the judgment.").
What is more, Florida's retroactivity analysis, as applied here,
is not contrary to well-established federal law.  Under the
federal retroactivity analysis set out in Teague v. Lane, 489 U.S.
288 (1989), "Ring and Hurst do not apply retroactively on
collateral review."  McKinney v. Arizona, 140 S. Ct. 702, 708
(2020) (citing Schriro v. Summerlin, 542 U.S. 348, 358 (2004)).

Ground 10 is denied as both untimely and meritless.

### k. Ground 11: Whether Florida's revised capital sentencing statute authorizes Foster's sentence

This ground is similar to the previous one, and it suffers
the same defects.  The Florida legislature codified Hurst v.
State's heightened capital sentencing standard in 2017.  Under the
revised Florida Statute § 921.141, a court may only impose the
death penalty if a jury unanimously (1) finds at least one
aggravating factor and (2) determines the defendant should be

sentenced to death.  Foster argues his death sentence violates his due process and Eighth Amendment rights because the jury did not unanimously recommend the death penalty.

Like Ground 10, this claim is barred by the statute of limitations.  It is not based on newly discovered evidence, so § 2244(d)(1)(D) does not apply.  See Frederick, supra, and Lo, supra.  Moreover, Ground 11 does not relate back to the original petition because it does not share a common core of operative facts with any of Foster's original claims.  See Mayle, supra.

Also like Ground 10, the state court denied this claim based on adequate and independent state-law principles.  In a successive Rule 3.851 motion, Foster argued his due process and Eighth Amendment rights were violated because the State did not prove every element of "capital first-degree murder" set out in the revised § 921.141.  The Florida Supreme Court again noted that Hurst does not apply retroactively to Foster's sentence.  Foster v. State, 258 So. 3d 1248, 1251 (Fla. 2018) (hereafter, "Foster IV").  The court then explained that Foster's argument is based on a misunderstanding of Florida law.  Florida has no crime called "capital first-degree murder."  Foster was convicted of the crime of first-degree murder, which is a capital felony, and "Foster's jury did find all of the elements necessary to convict him of the capital felony of first-degree murder—during the guilt phase." Foster IV, 258 So. 3d at 1252.

Foster argues this ground is not about retroactivity, but of course it is.   Foster seeks to overturn his sentence by retroactively applying Hurst and the revised § 921.141 to his sentence.   The Florida Supreme Court's decision not to retroactively apply either to Foster's case is an adequate and independent state-law basis for the denial of Ground 11.   And that retroactivity decision is not contrary to well-established federal law.   Lambrix v. Sec'y, DOC, 872 F.3d 1170, 1183 (11th Cir. 2017) ("[N]o U.S. Supreme Court decision holds that the failure of a state legislature to make revisions in a capital sentencing statute retroactively applicable to all those who have been sentenced to death before the effective date of the new statute violates the Equal Protection Clause, the Due Process Clause, or the Eighth Amendment.").   Foster's argument is built on the incorrect assumption that his sentence must comply with the subsequently enacted § 921.141.   Because federal law does not require the retroactive application of the statute, Foster is not entitled to habeas relief here.

Ground 11 is denied as untimely and meritless.

1. **Ground 12: Whether Foster's death sentence is cruel and unusual punishment because he was 18 years old at the time of the crime**

In his final habeas claim, Foster argues his sentence violates "evolving standards of decency" because he was 18 years old when he committed the murder.   Foster acknowledges that current Supreme

Court precedence does not support this ground, but he argues the law should change based on new scientific evidence.  The Florida Supreme Court declined to extend the restrictions on the death penalty beyond what current federal precedent requires:

> Foster, who was eighteen years old at the time of the murder, argues that the trial court erred when it summarily denied his claim that his death sentence is unconstitutional. He encourages this Court to adopt a more expansive view than that in Roper v. Simmons, 543 U.S. 551, 577, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (holding unconstitutional the imposition of the death penalty upon individuals who were under the age of eighteen at the time the murder was committed). In Roper, the Court said:
>
>> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. ... The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.
>
> Id. at 574, 125 S. Ct. 1183. Foster argues that newly discovered evidence reveals an emerging consensus in the scientific community that young adults are developmentally akin to juveniles, and he asks this Court to extend the protection in Roper. For the reasons explained below, Foster is not entitled to relief.
>
> In order to obtain relief on the basis of newly discovered evidence, "the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence." Marek v. State, 14 So. 3d 985, 990 (Fla.

2009). Additionally, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. Id. As newly discovered evidence, Foster cites articles from 2016, 2017, and earlier that focused on young adults ages eighteen to twenty-one and concluded that their cognitive development renders them more likely to engage in impulsive and risky behavior such as criminal activity. He also highlights objective indicia of consensus, including a national trend against sentencing young adult offenders to death and against carrying out the execution of those already sentenced. Foster suggests that recent actions by state legislatures support the prohibition of death sentences for defendants who were age twenty-one and under at the time of their crimes, but he admits that no state has passed a law specifically geared toward that age group. Foster also cites a 2018 American Bar Association resolution which recommended that the death penalty be prohibited as to defendants twenty-one years of age and younger at the time of their crimes. In sum, Foster argues that evolving standards of decency render his death sentence invalid under the Eighth Amendment. As he acknowledges, however, this Court has rejected similar claims of newly discovered evidence—most recently in Branch v. State, 236 So. 3d 981 (Fla. 2018).

Eric Scott Branch, while under a death warrant, argued that his death sentence was unconstitutional because he was twenty-one years old at the time of the murder. Id. at 985. In a manner very similar to Foster, and citing some of the same research, Branch argued that newly discovered evidence demonstrates that young people in their late teens and early twenties lack the cognitive development that is necessary to be eligible for the death penalty. Id. This Court rejected Branch's argument on procedural grounds and also rejected the claim of newly discovered evidence, saying: "[W]e have rejected similar claims on the basis that scientific research with respect to brain development does not qualify as newly discovered evidence." Id. at 986. Importantly, this Court also reaffirmed its adherence to the United States Supreme Court's holding in Roper. Id. at 987. This Court observed:

> Finally, the United States Supreme Court has continued to identify eighteen as the critical age for purposes of Eighth Amendment

jurisprudence. See Miller v. Alabama, 567 U.S. 460, 465, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) (prohibiting mandatory sentences of life without parole for homicide offenders who committed their crimes before the age of eighteen); Graham v. Florida, 560 U.S. 48, 74-75, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) (prohibiting sentences of life without parole for nonhomicide offenders who committed their crimes before the age of eighteen). Therefore, unless the United States Supreme Court determines that the age of ineligibility for the death penalty should be extended, we will continue to adhere to Roper.

Branch, 236 So. 3d at 987. Foster attempts to distinguish his case from Branch because Branch was twenty-one years old while Foster was eighteen years old at the time of their respective crimes. In light of Roper, this distinction has no merit. As we did in Branch, we reaffirm our adherence to Roper. Foster is not entitled to relief.

Foster IV, 258 So. 3d at 1253-54.

Foster concedes that the United States Supreme Court has not extended Roper to defendants over the age of 18. The Florida Supreme Court's rejection of this ground is thus not contrary to "clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). The Eleventh Circuit "has clarified that state courts are not obligated to extend legal principles set forth by the Supreme Court because AEDPA requires only that state courts "fully, faithfully and reasonably follow legal rules already clearly established by the Supreme Court.'" Barwick v. Sec'y, Fla. Dep't of Corr., 794 F.3d 1239, 1259 (11th Cir. 2015) (quoting Hawkins v. Alabama, 318 F.3d

1302, 1307 n.3 (11th Cir. 2003)) (rejecting a <u>Roper</u> argument by a defendant who was 19 years old when he committed murder).

The Florida Supreme Court correctly applied <u>Roper</u>.   Ground 12 is denied.

### IV.  Certificate of Appealability

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a certificate of appealability (COA).  "A [COA] may issue…only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, a petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were adequate to deserve encouragement to proceed further," <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (citations omitted). Foster has not made the requisite showing here and may not have a certificate of appealability on any ground of his original or supplemental petitions.

Accordingly, it is hereby

**ORDERED:**

(1) Petitioner Kevin Don Foster's Amended Petition for Writ of Habeas Corpus by a Person in State Custody (Doc.# 89) is **DENIED.**

(2) Foster is not entitled to a certificate of appealability.

(3) The Clerk is **DIRECTED** to terminate any pending motions and deadlines, enter judgment, and close this case.

**DONE and ORDERED** at Fort Myers, Florida, this ___30th___ day of October 2023.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

SA: FTMP-1

Copies:
Counsel of Record